Kesey Darnell Frank v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-069-CR

KESEY DARNELL FRANK APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

OPINION

------------

I.  Introduction

A jury convicted Appellant Kesey Darnell Frank of capital murder, and the trial court sentenced him to life in prison.  In six points, Frank complains that the trial court erred by overruling his motion to suppress, motion for an instructed verdict, and motion for new trial; by excluding a videotape from evidence; by admitting photographs of the deceased victim; and by making a misstatement of law in the jury charge.  We will affirm.

II.  Factual Background

On September 15, 2002, Frank, Adalberto Ponce-Duron, Jerry Jackson, Justin Ebert, and Stephanie Tacina met at a friend’s apartment in the Mack Park Apartments in Denton to watch a football game.  Around halftime, Jackson and a few others left to go to the store.  Before Jackson left, however, he and Tacina had an argument, and a “scuffle” occurred in the apartment complex’s parking lot.  Tacina suffered an injury to her head.
(footnote: 1)  Jackson left for the store, leaving Tacina in the parking lot.  

A resident of the apartments noticed Tacina staggering and holding her head and stomach.  The resident went to assist Tacina and after discovering a sizeable knot on the back of Tacina’s head, the resident called 911. 

Jackson and his acquaintances returned to the apartment complex to find an ambulance, the fire department, and a police car in the parking lot.  The police handcuffed and questioned Jackson, Frank, and Ebert.   About this time, Amanda Doyle and Tymeshia Turner arrived.
(footnote: 2)  Police ultimately arrested Jackson but released Frank and Ebert.  Frank, Ponce-Duron, Doyle, Turner, and Ebert, who were all present in the parking lot, were visibly upset that Jackson had been arrested and were overheard saying that they intended to “beat up” Tacina. 

Frank, Ponce-Duron, Doyle, Turner, and Ebert left the apartment complex in Doyle’s white four-door Hyundai.  They decided to find out which hospital Tacina had been taken to so that Doyle could beat her up.  On the way to the hospital, they discussed what they planned to do with Tacina after the assault. After locating Tacina at Denton Regional Hospital, they learned that she would be released in about an hour.  They decided to go to Ebert’s residence to pick up some money for marijuana and to then look for a place to leave Tacina; Ponce-Duron remained at the hospital. 

After leaving Ebert’s residence, the group stopped briefly at the house of one of Frank’s relatives, and Frank retrieved a gun; the gun turned out to be fake.  The group searched for a suitable place to leave Tacina after the assault.  They pulled into a driveway, but deemed the location unsatisfactory, and then pulled into a trailer park across the street.  While at the trailer park, Ebert picked up a brick and placed it on the floorboard of the car.
(footnote: 3) 
 The group then returned to the hospital. 

At the hospital, Doyle, Ebert, and Frank stood behind a sign and waited for Turner to pick up Tacina and Ponce-Duron (they thought Tacina might not enter the car if she saw Doyle), and Frank broke the brick that Ebert had found at the trailer park into two halves.  Turner picked up Tacina and Ponce-Duron and then pulled up where Doyle, Ebert, and Frank were waiting, allowing them to hop into the car.  After Frank got in the car, he struck Tacina on the head with one of the pieces of brick and then with his fists.  Tacina screamed, but no one responded.  As they were driving, Frank and Ponce-Duron continued to strike Tacina, pushing her down to the floorboard.  Doyle turned around and also struck Tacina a few times from her position in the front passenger seat. Tacina was bleeding from her head, and a “large amount” of blood collected in the back seat. 

The group eventually ended up at the residence of one of Doyle’s friends, Tasia Hoffman, between 11:00 p.m and 12:00 a.m.  Hoffman looked inside of Doyle’s car and saw Frank, Ponce-Duron, Ebert, and Tacina.  Hoffman observed that Tacina’s back was bruised, that she had burn marks on her, and that her hair was bloody looking.  Turner said that they had beaten up Tacina because she had caused Jackson to be arrested, and Doyle asked Hoffman if Doyle could dump Tacina’s body in the field near Hoffman’s home.  Hoffman’s father appeared, however, and instructed Hoffman to come back inside her house. The group then left.

Frank, Ponce-Duron, Doyle, Turner, and Ebert drove around for some time before pulling into a field.  They all exited the car, and Ponce-Duron pulled Tacina out of the car and tried to break her neck.  Frank ripped off Tacina’s shirt, wrapped it around her neck, and also tried to break her neck.  Both were unsuccessful.  Doyle went to the car and removed a pair of scissors from the glove compartment.  Ponce-Duron cut Tacina’s throat with the scissors and stabbed her in the stomach multiple times.  The group departed, leaving Tacina’s body in the field.  

The group then drove to Doyle’s house where Frank and Ponce-Duron showered and changed clothes.  They collected the items that had Tacina’s blood on them and placed the items in a trash bag.  They then went to a car wash and cleaned Doyle’s car.  Frank and Ponce-Duron cleaned the back seat while Doyle cleaned the front seat.  Turner then took Frank home. 

The next morning, Ebert, Doyle, Turner, and Ponce-Duron picked up cleaning supplies from a friend of Ebert’s and some bleach from Turner’s house and went to Ponce-Duron’s house where Ponce-Duron cleaned Doyle’s car some more, removing portions of it that were blood stained.  They burned the trash bag containing the bloody items.  

The Lewisville Police Department assigned Detective Edward Barrett to be the lead detective on the case.  During the course of his investigation, Detective Barrett found a piece of brick in Ponce-Duron’s back yard and another piece of brick near the entrance of Denton Regional Hospital. A subsequent analysis of both pieces showed that they matched; the pieces had previously formed one brick.  The brick piece discovered in Ponce-Duron’s back yard contained trace evidence, including one piece of hair.  Subsequent microscopic analysis of the hair found on the brick and a sample hair taken from Tacina’s body established that the hair on the brick belonged to Tacina.  Blood samples taken from Doyle’s car also matched a known sample of Tacina’s blood taken during her autopsy.  

The medical examiner listed Tacina’s cause of death as multiple sharp force injuries.  Tacina’s autopsy showed that her trachea had been incised, or cut through completely, possibly with a pair of scissors.  She also had eleven stab wounds to her abdomen, a burn over her left cheek, and defensive wounds. 

III.  Motion for New Trial

Frank filed a motion for new trial.  In a single sentence, he alleged, “Newly discovered evidence has been obtained concerning the lack of truthfulness of a key State witness, namely Justin Ebert.”  Frank attached the affidavit of Omari McKinley to his motion for new trial.  McKinley’s affidavit is two paragraphs and states that he met Ebert several years ago, that Ebert made statements “indicating that in return for his cooperation with law enforcement authorities he would not be held criminally responsible for the harm to Stephanie Tacina,” and that Ebert had made “several inconsistent statements . . . regarding the level of his involvement in the [offense].”  Subsequently, the State filed a stipulation of evidence indicating its discovery that Ebert, not Frank, obtained the brick from the trailer park.  Frank alleges and the State agrees, that after the State filed this stipulation of evidence the attorneys met with the trial court judge in chambers to bring the stipulation of evidence to her attention.  Frank’s motion for new trial was nonetheless overruled by operation of law.

In his first issue, Frank argues that “[t]he trial court violated Appellant’s federal and state constitutional right to a fair trial by overruling his Motion for New Trial.”  Frank does not claim that the trial court erred by denying him a hearing on his motion for new trial.  
Compare Wallace v. State
, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003) (holding that when defendant claims error in failure to grant motion for new trial hearing, appellate court must address that issue first).  Frank does not claim that McKinley’s cursory affidavit or the statements set forth therein satisfied the requisites necessary to entitle him to a new trial based on newly discovered evidence.  
See Keeter v. State
, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002) (setting forth four requisites).  Instead, Frank argues that after the State filed its stipulation of evidence—indicating Ebert’s admission that in fact he, not Frank, picked up the brick at the trailer park—the trial court should have granted a new trial based on newly discovered evidence.

A new trial shall be given to an accused where material evidence favorable to the accused has been discovered since trial.  
Tex. Code Crim. Proc. Ann.
 art. 40.001 (Vernon Supp. 2005).  A trial court has discretion to decide whether to grant a new trial based upon newly discovered evidence, and its ruling will not be reversed absent an abuse of discretion.  
Keeter
, 74 S.W.3d at 37.  The trial court's discretion extends to situations in which the newly-discovered evidence is the retraction of a witness's testimony. 
 Id.
  
To establish an abuse of discretion in the failure to grant a new trial based on newly discovered evidence, the appellant must show that (1) the evidence was unknown to him before trial, (2) his failure to discover the evidence was not due to a lack of diligence, (3) it is probably true, and its materiality will probably bring about a different result upon a new trial; and (4) it is competent, not merely cumulative, corroborative, collateral, or impeaching.  
Id. 
at 36-37.  Motions for new trial based upon newly discovered evidence are not favored by the courts and are viewed with great caution.  
Drew v. State
, 743 S.W.2d 207, 225 (Tex. Crim. App. 1987).

On appeal, Frank makes no effort to show that Ebert’s changed testimony about who picked up the brick in the trailer park would probably bring about a different result upon a new trial.
(footnote: 4)  The evidence established that Frank, Ponce-Duron, Doyle, Turner, and Ebert were together in Doyle’s vehicle when they pulled into the trailer park and the brick was obtained.  Ebert’s false testimony only concerned 
who 
picked up the brick.  It did not negate the evidence that Frank nevertheless used a piece of that brick to strike Tacina on the head, causing her serious injury.  Ebert’s perjury also does not discount or negate the evidence that Frank participated in the plan to kidnap Tacina from the hospital, that Frank struck Tacina with his hands while in Doyle’s vehicle, that Frank tried to break Tacina’s neck (or strangle her) with her own shirt just before Ponce-Duron cut her throat, and that Frank disposed of his bloody clothes and helped Ponce-Duron clean Tacina’s blood out of Doyle’s vehicle.  Because the record before us does not establish that Ebert’s new testimony would probably bring about a different result, we hold that the trial court did not abuse its discretion by permitting Frank’s motion for new trial to be overruled by operation of law.
(footnote: 5)  
See Keeter
, 74 S.W.3d at 36-37.   We overrule Frank’s first point.

IV.  Motion for Instructed Verdict

In his second point, Frank contends that the trial court erred by denying his motion for instructed verdict.  Frank argues that the “evidence did not support the position that the Appellant at any point desired the death of” Tacina and that the evidence was insufficient to prove that he “intended or participated as a party in the death of” Tacina.  

A.  Standard of Review
 

A challenge to the denial of a motion for instructed verdict is actually a challenge to the legal sufficiency of the evidence.  
McDuff v. State
, 939 S.W.2d 607, 613 (Tex. Crim. App.), 
cert. denied
, 522 U.S. 844 (1997); 
Franks v. State
, 90 S.W.3d 771, 789 (Tex. App.—Fort Worth 2002, no pet.).  
In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to 
the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Ross v. State
, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

B.  Capital Murder and Law of Parties

The law of parties applies to the offense of capital murder, and a 
person commits capital murder if he intentionally or knowingly causes the death of an individual and intentionally commits the murder in the course of committing or attempting to commit, among other things, kidnapping, obstruction, or retaliation.  
Tex. Penal Code Ann.
 § 19.02(b)(1) (Vernon 2003), § 19.03(a)(2) (Vernon 2003); 
Johnson v. State
, 853 S.W.2d 527, 534 (Tex. Crim. App. 1992), 
cert. denied
, 510 U.S. 852 (1993).

Under the law of parties, “[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.”  
Tex. Penal Code Ann.
 § 7.01(a) (Vernon 2003).  A person is “criminally responsible” for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  
Id
. § 7.02(a)(2). 
Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement.  
Ransom v. State
, 920 S.W.2d 288, 302 (Tex. Crim. App.) (op. on reh’g), 
cert. denied
, 519 U.S. 1030 (1996).  In determining whether a defendant participated in an offense as a party, the fact finder may examine the events occurring before, during, and after the commission of the offense and may rely on actions of the defendant that show an understanding and common design to commit the offense.  
Id
.; 
Cordova v. State
, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985), 
cert. denied
, 476 U.S. 1101 (1986).  

Further, section 7.02(b) of the penal code provides

[i]f, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.  

Tex. Penal Code Ann.
 § 7.02(b).

The law of parties need not be pled in the indictment, 
Marable v. State
, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002), and circumstantial evidence may be used to prove party status.  
Cordova
, 698 S.W.2d at 111. 
  

C.  Evidence Sufficient To Convict Under Law of Parties

Here, the court’s charge to the jury included a charge on the law of parties following sections
 7.02(a)(2) and 7.02(b) of the penal code, and 
the jury returned a verdict finding Frank guilty of capital murder.  Thus, the jury concluded either (1) that Frank intentionally promoted or assisted in the commission of Tacina’s murder in
 the course of committing or attempting to commit the offense of kidnapping, obstruction, or retaliation or, (2) that in facilitating a conspiracy to commit kidnapping, aggravated kidnapping, aggravated assault, obstruction, or retaliation, Ponce-Duron intentionally caused the death of Tacina and that this act was committed in furtherance of the conspiracy and should have been anticipated by Frank.

Before addressing the sufficiency of the evidence, we will address an argument that Frank appears to assert within the context of this second point, specifically, that the trial court should have granted his motion for instructed verdict because he did not have the intent to kill Tacina.  To convict one of capital murder 
as a party 
under section 7.02(a)(2), the State need only prove that the defendant harbored the specific intent to promote or assist the commission of an intentional murder.  
Lawton v. State
, 913 S.W.2d 542, 555 (Tex. Crim. App. 1995), 
cert. denied
, 519 U.S. 826 (1996),
 overruled on other grounds, Mosley v. State
, 983 S.W.2d 249, 263 (Tex. Crim. App. 1998).  The State does not have to show that the party also had the specific intent to kill.  Likewise, section 7.02(b) expressly allows one to be convicted as a party to a felony committed by a co-conspirator even though the accused party has no intent to commit that felony.  
Tex. Penal Code Ann.
 § 7.02(b); 
Snow v. State
, 721 S.W.2d 943, 949 (Tex. App.—Houston [1st Dist.] 1986, no pet.) (reasoning absence of intent to kill irrelevant to conviction under law of parties).  Because the court charged Frank under the law of parties, the State was not required to show that he had the intent to kill Tacina.  
See Andrews v. State
, 744 S.W.2d 40, 51-52 (Tex. Crim. App. 1987), 
cert. denied
, 488 U.S. 871 (1988) (“[W]e strongly disagree with appellant’s claim that . . . when the State is relying upon the provisions of Section 7.02(a)(2) and (b) for a conviction for Capital Murder by complicity responsibility, one or more of the above culpable mental states . . . must be proved by the evidence, beyond a reasonable doubt.  As it now stands, our statutes do not require any of these culpable mental states to be proved . . . .”); 
Carmona v. 
State, 76 S.W.3d 29, 31-33 (Tex. App.—Amarillo 2001, pet. ref’d) (“[W]e decline appellant’s invitation to engraft new language onto Section 7.02(a)(2) to require that a person must have specific intent to kill in order to be criminally responsible for actions of another in committing murder as set out in Section 19.02(b)(2).”); 
see also Springer v. State
, No. 07-95-0303-CR, 1997 WL 184726, *1-2 (Tex. App.—Amarillo April 16, 1997, no pet.) (not designated for publication); 
Batiste v. State
, No. 01-96-01480-CR, 1998 WL 418124, *1-2 (Tex. App.—Houston [1st Dist.] July 23, 1998, pet. ref’d) (not designated for publication).

Turning to his sufficiency argument, the evidence shows that Frank, Doyle, Turner, Ponce-Duron, and Ebert were present when Jackson, Frank’s cousin, was arrested.  
All were upset about Jackson’s arrest, and they immediately proceeded to determine which hospital Tacina had been taken to so that Doyle could beat her up.  
On the way to the hospital, they discussed what they planned to do with Tacina after the assault.  After learning that Tacina would be released in about an hour, Frank accompanied Doyle, Turner, and Ebert on a brief trip to, among other things, find a suitable location to dump Tacina after the assault.  Turner picked up Tacina and Ponce-Duron in Doyle’s vehicle and stopped to let Frank, Doyle, and Ebert, who had been hiding behind a sign, jump in.  Upon entering, Frank struck Tacina on the head with a piece of brick and struck her with his hands later during the drive.  All were fully participating, and Ponce-Duron later exclaimed that they would have to kill Tacina because they had taken it too far.  The State presented evidence that, after finding a suitable location, Frank ripped off Tacina’s shirt, wrapped it around her neck, and tried to break her neck in an effort to kill her.  Unsuccessful, Ponce-Duron cut Tacina’s throat and stabbed her multiple times in the abdomen as Frank and the others observed.  Frank and Ponce-Duron showered and changed clothes at Doyle’s house, and they collected items that had blood on them and placed them in a trash bag.  Afterwards, Frank accompanied Ponce-Duron, Doyle, Turner, and Ebert to a car wash where he and Ponce-Duron attempted to wash and clean the blood out of Doyle’s car.  In his conversation with Frank, not long after the murder, Detective Barrett noticed a bandaged cut on one of Frank’s fingers. 

After viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Frank acted with the intent to promote or assist the commission of the offense of capital murder and that Frank encouraged, aided, or attempted to aid Ponce-Duron in the commission of the offense. 
 
See
 
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  Accordingly, we hold that the trial court did not err  when it denied Frank’s motion for instructed verdict.  We overrule Frank’s second point.

V.  Voluntariness of Oral Statement

In his fifth point, Frank argues that the trial court violated his federal and state constitutional right to remain silent by overruling his motion to suppress an audiotaped statement he made to police and allowing it to be played before the jury.  
Frank argues that his statement was involuntary because the detective taking the statement did not make an inquiry into his educational background or IQ and did not elaborate on the 
Miranda
(footnote: 6) 
warnings given. 
 
The State maintains that Frank’s statement was made knowingly and voluntarily. Frank filed a motion to suppress his audiotaped statement, and the trial court conducted a 
Jackson v. Denno
(footnote: 7) 
hearing to determine its admissibility.  
At a 
Jackson v. Denno 
hearing, the trial court is the sole fact finder and may choose to believe or disbelieve any or all of the witnesses’ testimony.  
Jackson
, 378 U.S. at 276-77, 84 S. Ct. at 1780-81; 
Dewberry v. State
, 4 S.W.3d 735, 747 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We will not disturb the trial court’s findings absent an abuse of discretion.  
Alvarado v. State
, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).  An abuse of discretion will be found only when the trial judge’s decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree.  
Montgomery v. State
, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh’g).

The statement of an accused may be used in evidence if it was freely and voluntarily made without compulsion or persuasion.  
Tex. Code Crim. Proc. Ann.
 art. 38.21 (Vernon 2005).  A confession is involuntary if circumstances show that the defendant’s will was “overborne” by police coercion.  
Creager v. State
, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997).  In other words, a statement is involuntary if the record reflects “official, coercive conduct of such a nature” that any statement obtained thereby is “unlikely to have been the product of an essentially free and unconstrained choice by its maker.”  
Alvarado
, 912 S.W.2d at 211.  The determination of whether a confession is voluntary is based on an examination of the totality of the circumstances surrounding its acquisition.  
Reed v. State
, 59 S.W.3d 278, 281 (Tex. App.—Fort Worth 2001, pet. ref’d).

Detective Barrett testified at the hearing that he arrested Frank pursuant to a warrant on September 18, 2002.  Detective Barrett took Frank to the Lewisville Police Department and asked him if he would like to give a statement.  He agreed to give one, and he was taken to an interview room where Detective Barrett audio recorded the interview.
(footnote: 8)  At the outset of the interview, Detective Barrett read Frank the 
Miranda 
warnings.  Detective Barrett testified that Frank never indicated that he wanted to take a break during the interview and that he never invoked any of the rights explained to him.  Detective Barrett testified that Frank understood each and every right and that he still wanted to proceed with the interview.  The Texas Code of Criminal Procedure only requires that an accused be “
given the warning 
in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning.”  
Tex. Code Crim. Proc. Ann.
 art. 38.22, § 3(a)(2) (Vernon 2005) (emphasis added).  Accordingly, the evidence shows that, based on the totality of the circumstances, Frank’s statement was made knowingly and voluntarily.  Nothing in the record indicates that Frank is mentally impaired or has a low IQ.  The evidence supports the trial court’s ruling.  We hold that the trial court did not abuse its discretion by denying Frank’s motion to suppress.  We overrule Frank’s fifth point.

VI.  Videotape—Hearsay

In his third point, Frank argues that the trial court violated his federal and State right to a fair trial by excluding a videotape of statements by Doyle “that exonerated and proved” his innocence.  Frank contends that the videotape was admissible as an exception to the hearsay rule pursuant to Texas Rule of Evidence 803(24)—a statement against penal interest.  The State argues that the trial court properly excluded the videotape as inadmissible hearsay. We review a trial court’s decision to admit or exclude evidence of a statement against penal interest for an abuse of discretion.  
James v. State
, 102 S.W.3d 162, 176 (Tex. App.—Fort Worth 2003, pet. ref’d).  The trial court’s ruling will not be reversed as long as it is within the “zone of reasonable disagreement.”  
Montgomery
, 810 S.W.2d at 379-80; 
Couchman v. State
, 3 S.W.3d 155, 158 (Tex. App.—Fort Worth 1999, pet. ref’d).

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.  
Tex. R. Evid.
 801(d).  Rule 803 lists a number of hearsay exceptions, and rule 803(24) provides in relevant part as follows:

Statement Against Interest
.  A statement which . . . at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in declarant’s position would not have made the statement unless believing it to be true.  In criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.  

Tex. R. Evid.
 803(24).  Whether a statement is admissible in accordance with rule 803(24) requires a two-step inquiry.  
Bingham v. State
, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999).  First, the trial court must determine whether the statement in question tends to expose the declarant to criminal liability.  
Id
.  Second, the trial court must determine whether there are corroborating circumstances that clearly indicate the trustworthiness of the statement.  
Id
.  The party seeking admission of the statement has the burden to make this showing.  
James
, 102 S.W.3d at 176.

In the instant case, the videotape offered into evidence by Frank was made by Sherika Modester, a friend of Doyle’s, with the help of David Johnson at Modester’s apartment on July 22, 2003.  After the murder, Doyle evidently made a number of statements to Modester concerning Frank’s involvement, or lack thereof, in the murder of Tacina.  Concerned about Frank’s pending legal situation, Modester and Johnson decided to set up a video recorder and to attempt to record Doyle making these statements.  The tape shows Doyle and Modester having a conversation.   

We have reviewed the videotape, and a large portion of the conversation between Doyle and Modester is unintelligible because of loud background noise from a television.
(footnote: 9)  We were, however, able to understand Doyle say that (Ponce-Duron) was the only one who did anything to Tacina and that she, Frank, Turner, and Ebert did not do anything to Tacina.  Doyle also questions why Ebert was charged with aggravated assault while she, Frank, and Turner were charged with capital murder.  We further understand Doyle to be discussing probation and capital murder in some context.  As the State points out, Doyle’s statements could be construed as placing her at the murder scene, but admitting presence at the scene is not necessarily against Doyle’s penal interest because mere presence at the scene of the offense, by itself, is insufficient to support criminal responsibility as a party.  
Felters v. State
, 147 S.W.3d 488, 490-91 (Tex. App.—Fort Worth 2004, pet. ref’d).  We cannot agree with Frank’s contention that Doyle admitted her participation in Tacina’s murder on the videotape.  To the contrary, she said she did not do anything to Tacina.  If Doyle admitted responsibility, we were unable to understand it.  Based on the videotape, we conclude that Doyle’s statements do not tend to expose her to criminal liability.  
See Bingham
, 987 S.W.2d at 57.
(footnote: 10)  Accordingly, because the understandable portions of the videotape contain only statements not falling under any recognized exception to the hearsay rule, the trial court did not abuse its discretion by excluding the videotape.  
Tex. R. Evid.
 802, 803.  We overrule Frank’s third point.

VII. photographs

In his fourth point, Frank argues that he was denied his right to a fair trial because the trial court admitted “inflammatory and prejudicial” crime scene and autopsy photographs of Tacina. 
 Frank contends that the cumulative effect of the “grotesque images” outweighed any probative value they may have had.
(footnote: 11) The admissibility of a photograph is within the sound discretion of the trial judge.  
Paredes v. State
, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004).  We will not disturb a trial court’s ruling admitting or excluding evidence so long as its decision falls within the “zone of reasonable disagreement.”  
See Montgomery
, 810 S.W.2d at 391.

Under Texas Rule of Evidence 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  
Tex. R. Evid.
 403.  A rule 403 analysis by the trial court should include, but is not limited to, the following considerations: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent’s need for the evidence.  
Erazo v. State
, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004).  A court may consider the following factors in determining whether the probative value of a photograph is substantially outweighed by the danger of unfair prejudice: the number of photographs, the size of the photograph, whether they are in color or black and white, whether they are gruesome, whether the body is naked or clothed, and whether the body has been altered by autopsy.  
Reese v. State
, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000).

Autopsy photographs are generally admissible unless they depict mutilation caused by the autopsy itself.  
Rayford v. State
, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003), 
cert. denied
, 125 S. Ct. 39 (2004).  Where pictorial evidence will help the jury to understand verbal testimony, such as the technical language used by a medical doctor in describing the injuries sustained by a victim of a crime, the photograph is generally admissible.  
Harris v. State
, 661 S.W.2d 106, 107 (Tex. Crim. App. 1983).  Photographs that depict the nature, location, and extent of a wound have been declared probative enough to outweigh any prejudicial effect.  
Legate v. State
, 52 S.W.3d 797, 807 (Tex. App.—San Antonio 2001, pet. ref’d).  Overall, the photograph must be helpful to the jury; “[i]f there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the helpful aspects.”  
Erazo
, 144 S.W.3d at 491-92.

A.  Crime Scene Photographs

States’ Exhibits 13 through 21 depict the crime scene.  They were published to the jury using “Power Point.”  Exhibits 13, 14, and 15 were taken from a distance and show the area surrounding Tacina’s body.  Detective Barrett testified that Tacina was found in a vacant lot between a housing development and a trailer park, and Ebert described the location that was chosen to murder Tacina and dump her body as an “excluded area” with a “little dirt mound.”  Accordingly, the photographs were helpful to the jury because they provided a visual context for Detective Barrett’s and Ebert’s testimony describing the crime scene.  Moreover, Tacina’s injuries are not visible in any of the photographs.

Exhibits 16, 17, and 18 depict Tacina’s entire body; she is lying on her back, wearing only a pair of shorts and tennis shoes.  Each photograph is taken from a different angle, and each photograph is in color.  None of Tacina’s wounds are visible in exhibit 16, but the stab wounds to her stomach are visible in exhibit 17, and the injury to her throat is visible in exhibit 18.  Exhibits 19, 20, and 21 are close-ups focusing on the injuries themselves.  The trial court admitted the photographs and published them to the jury after Detective Barrett testified regarding where and how Tacina was found; the State did not spend a substantial amount of time discussing the photographs.  The probative value of the photographs is high.  They provide strong visual evidence corroborating the testimony of Ebert, Detective Barrett, and a portion of Hoffman’s testimony concerning how Tacina was murdered, the injuries inflicted, and the ultimate result of the events that took place on September 15, 2002.  
Moreover, the State’s need for the evidence was relatively high.  As the State points out, the only other evidence it had to establish the circumstances surrounding Tacina’s murder came primarily from Ebert and Hoffman, one of whom participated in the events leading up to and after the murder.  As the court of criminal appeals has stated, “Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions.”  
Chamberlain v. State
, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999), 
cert. denied
, 528 U.S. 1082 (2000).  Thus, although the photographs arguably depict “disagreeable realities,” “they depict nothing more than the reality of the brutal crime committed” and helped the jury to understand the verbal testimony.  
Id.
  We hold that the probative value of State’s Exhibits 13 through 21 is not substantially outweighed by its prejudicial effect.  
See
 
Tex. R. Evid.
 403.  Thus, the trial court did not abuse its discretion by admitting State’s Exhibits 13, 14, 15, 16, 17, 18, 19, 20, and 21. 
 See
 
Paredes
, 129 S.W.3d at 539. 

B.  Autopsy Photographs

State’s Exhibits 43 through 58 are autopsy photographs of Tacina introduced and admitted during the testimony of Gary L. Sisler, M.D., the medical examiner who performed Tacina’s autopsy.  Like the crime scene photographs, they were published to the jury using “Power Point.”  All of the photographs are in color, and each one depicts an injury or different view of an injury suffered by Tacina.
(footnote: 12)  Before the photographs were admitted, Dr. Sisler affirmed that the photographs would assist him in his testimony concerning Tacina’s injuries and would also help the jury understand his testimony.  Dr. Sisler testified that Tacina’s manner of death was homicide and that the cause of death was multiple sharp force injuries.  He further testified concerning the extent of the injuries suffered, how they were inflicted, and when they likely occurred in relation to Tacina’s death.  The photographs do not depict mutilation caused by the autopsy, but the nature, location, and extent of the wounds as testified to by Dr. Sisler. The photographs thus had the effect of illustrating Dr. Sisler’s testimony.  Accordingly, we hold that the probative value of State’s Exhibits 43 through 58 is not substantially outweighed by their prejudicial effect, if any.  
See
 
Tex. R. Evid.
 403.  Thus, the trial court did not abuse its discretion by admitting State’s Exhibits 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58.  
See Paredes
, 129 S.W.3d at 539.  We overrule Frank’s fourth point.

VIII.  Jury Instruction—Reasonable Doubt

In his sixth point, Frank argues that the trial court erred by including the following language in its charge to the jury: “It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution’s proof excludes all ‘reasonable doubt’ concerning the defendant’s guilt.”  Frank argues that it was error to instruct the jury on the definition of reasonable doubt in light of 
Paulson v. State
, 28 S.W.3d 570 (Tex. Crim. App. 2000), and that the instruction “amounted to a misstatement of law and contradicted the prohibition of defining reasonable doubt as required by the Court of Criminal Appeals.” 

We have previously addressed the propriety of including this portion of the 
Geesa
(footnote: 13) 
instruction in the jury charge and have found it to be proper.  
See Pope v. State
, 161 S.W.3d 114, 125 (Tex. App.—Fort Worth 2004, no pet.); 
Best v. State
, 118 S.W.3d 857, 865 (Tex. App.—Fort Worth 2003, no pet.); 
see also Woods v. State
, 152 S.W.3d 105, 115 (Tex. Crim. App. 2004),
 cert. denied
, 125 S. Ct. 2295 (2005).  Accordingly, we overrule Frank’s sixth point.

IX.  Conclusion

Having overruled all six of Frank’s points, we affirm the trial court’s judgment.    

SUE WALKER

JUSTICE

PANEL A: LIVINGSTON, DAUPHINOT, and WALKER, JJ.

DAUPHINOT, J. filed a dissenting opinion.

PUBLISH

DELIVERED:
 
December 22, 2005

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-069-CR

KESEY DARNELL FRANK APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

DISSENTING OPINION

------------

Because the majority does not examine the effects of the State’s primary witness’s admitted perjury, I must respectfully dissent.

It is undisputed that Ebert, not Appellant, obtained the brick used to assault the complainant.  Ebert picked up the brick and put it on the floorboard of the car before leaving for the hospital where they planned to kidnap the complainant.  This action shows Ebert’s intent to use a weapon, his degree of complicity, and his independent planning.  Ebert lied at trial about who picked up the brick and about his level of involvement in the offense.  Indeed, his trial testimony suggested that he was merely present when the murder was committed.

Yet the majority dismisses Appellant’s complaint that the trial court abused its discretion by denying his motion for new trial with the observation that “On appeal, [Appellant] makes no effort to show that Ebert’s changed testimony about who picked up the brick in the trailer park would probably bring about a different result upon a new trial.”
(footnote: 14)  The majority relies on case law that is, at best, confusing.  

As the Texas Court of Criminal Appeals recognized in 
Keeter
, “
Article 40.001
[
(footnote: 15)]
 . . . provides:  ‘A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial.’”
(footnote: 16)  
Shall
, of course, is mandatory, not precatory.
(footnote: 17)  The 
Keeter 
court 
determined that the term “material” was ambiguous and turned to extratextual factors to interpret the legislature’s attempt to clarify the mandate that the trial court must grant a new trial when newly discovered evidence favorable to the accused was the basis of a motion for new trial.
(footnote: 18)  In interpreting the term “material,” the 
Keeter
 court decided that the new statute was merely a clarification of the former appellate rule governing the same subject matter.
(footnote: 19)  Consequently, the 
Keeter
 court announced that it would interpret the new statute in conformity with prior caselaw and continue to adhere to the four-part test that the majority in the case before us now applies.
(footnote: 20)  According to the 
Keeter
 court, materiality in the context of newly discovered evidence includes the requirements that 

(1) the newly discovered evidence was unknown or unavailable to the movant at the time of his trial;

(2) the movant’s failure to discover or obtain the evidence was not due to a lack of diligence; 

(3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching;  and,

(4) the new evidence is probably true and will probably bring about a different result on another trial.
(footnote: 21)  

Given the clear wording of the statute, the disparate treatment by the Texas Court of Criminal Appeals of materiality in other contexts, and this court’s burden of assessing harm, it is difficult for me to conclude that the 
Keeter
 materiality test 
requires
 the defendant to satisfy all four prongs of the Court’s test.
  To harmonize the 
Keeter
 line with conflicting case law and the plain wording of the statute, it would appear to me that the four-pronged test for determining materiality is to be treated as a guide to interpreting the statute, not as a replacement for the statute.

According to the majority opinion, it is Appellant’s burden to show that the newly discovered evidence is probably true and that its materiality will probably bring about a different result upon a new trial.
(footnote: 22)  
Although couched in terms of demonstrating materiality on appeal, the substance of the issue in the case before us is whether Appellant can show that he was harmed by the jury’s reaching a verdict it would not have reached had not the State’s eyewitness proffered perjured testimony concerning his role, and Appellant’s role, in the commission of the murder.  As a result, the majority, in following 
Keeter
, would require Appellant to show that Ebert’s perjured testimony harmed him.  But the Texas Court of Criminal Appeals has repeatedly reminded the intermediate appellate courts that “
neither the State nor appellant must demonstrate harm when an error has occurred.  Rather, it is the appellate court’s duty to assess harm after a proper review of the record.”
(footnote: 23)
 The materiality of the new evidence in this case is self-evident:  How much more material could evidence of a murder be than the identity of the person who provided the murder weapon intending that it be used to commit the murder?  Similarly, the harm is self-evident:  Conviction based on perjured testimony is per se a denial of due process.
(footnote: 24)  Yet, the fourth prong of the test approved by the 
Keeter 
court and applied by the majority appears, in a literal sense, to require that the movant prove harm in the same way that a defendant bears the burden of proving an affirmative defense.  The 
Shutz 
court stated,

We have explained that, in evaluating the harm that a defendant has suffered as a result of a trial court’s error, [w]e do not resolve the issue by asking whether the appellant met a burden of proof to persuade us that he suffered some actual harm.  No party should have a burden to prove harm from an error, and there ordinarily is no way to prove “actual” harm.  Burdens and requirements of proving actual facts are appropriate in the law of evidence, but they have little meaning for the harmless error decision.
(footnote: 25)  

What burden does a movant for new trial under Article 40.001 have?  Surely it cannot be greater than the burden imposed on an applicant seeking extraordinary relief.  In 
Ex parte Richardson
, the Texas Court of Criminal Appeals clearly set out the burden of an applicant seeking postconviction habeas corpus relief based on a 
Brady
 violation:

Applicant must first show that the State failed to disclose evidence, regardless of the prosecution’s good or bad faith.  He must then show that the withheld evidence is favorable to applicant.  Finally, the applicant must show that the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.  As in any habeas proceeding, the applicant must prove the constitutional violation and his entitlement to habeas relief by a preponderance of the evidence.
(footnote: 26)

Like the case before us, 
Richardson
 also dealt with perjured testimony.  The only difference between 
Richardson
 and the case now before this court is the timing of the complaints:  Richardson’s complaint was brought in a post-conviction application for writ of habeas corpus, and Appellant’s complaint was brought in a motion for new trial. The 
Richardson
 court required only that Richardson provide a sufficient record to show he was entitled to relief, not that he argue the point so convincingly that he sway the appellate court.  That is, Richardson had the burden of production, not persuasion.  In 
Richardson
, the Texas Court of Criminal Appeals performed this analysis:

Lastly, applicant must show that the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.  Applicant’s habeas hearing spanned fifteen full days and included testimony from forty-five witnesses.  Among his many factual findings regarding applicant’s claims, the habeas trial judge  determined that “[t]here [was] no question but that by the time of applicant’s trial Anita Hanson’s credibility was a major issue in the case.”  The habeas trial judge heard extensive testimony regarding Anita Hanson’s credibility (or lack thereof), the State’s knowledge of her credibility problems, the circumstances of her year secreted away in protective custody, and whether Hanson had agreed to testify against applicant in return for the District Attorney’s explicit or implicit promise not to prosecute her for killing Napoleon Ellis.

Anita Hanson’s eyewitness testimony clearly was crucial to the State’s capital murder case against applicant.  Her account placed applicant at the murder scene at the time of the killings and assigned primary responsibility for the murders to applicant, whom Hanson claimed was in charge and ordered Hanson to shoot Ellison.  She was the only eyewitness who testified to the actual killings and applicant’s participation.  The State’s other witnesses established only that (i) appellant possessed a motive to commit the murders and intended to act on that motive, and (ii) two witnesses had observed him firing a machine gun on some prior date.  It was upon her testimony that the jury convicted applicant of capital murder and sentenced him to death.  Applicant’s co-defendants, however, who were tried separately, were either acquitted or their indictments were dismissed as, over time, Anita Hanson’s credibility was fatally impeached by her ever-increasing number of self-admitted perjurious statements.  Her story unraveled entirely in subsequent trials.  We find that applicant has demonstrated a reasonable probability that, had the Goldston diary been timely disclosed and the six law enforcement officers testified, Anita Hanson’s credibility would have not only been impeached, but severely undermined.  Because her testimony was critical to the State’s case, we agree with the habeas judge who concluded: “I find as a matter of law that the evidence would, in all likelihood, create the probability sufficient to undermine the confidence in the outcome of the proceeding.”
(footnote: 27)

In 
Ex parte Adams,
(footnote: 28) the Texas Court of Criminal Appeals addressed specifically the question of perjured testimony and the materiality requirement:

In 
Giglio v. United States
, the Supreme Court decided that evidence of a promise of leniency to a witness made by another prosecutor should have been disclosed to the defense even if the prosecutor trying the case acted in good faith and did not know of the offer because a “promise made by one attorney must be attributed to the Government.”  Accordingly, the Court concluded that the government’s failure to disclose the impeachment evidence was a violation of due process.  In addition, the Court articulated a standard for materiality, left unexplained in 
Brady
, by stating that “if ‘the false testimony could ... in any reasonable likelihood have affected the judgment of the jury,’” then it was sufficiently material to require a new trial.

In 
United States v. Agurs
, the Court established several different standards of materiality.  First, in cases where the prosecution knew or should have known that perjured testimony was utilized to secure a conviction then materiality would be present and a new trial ordered “if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.”  The Court believed that such a standard was appropriate because such cases “involve a corruption of the truth-seeking function of the trial process.”

Second, the Court observed that if the defense makes a specific pretrial request for exculpatory evidence and the prosecutor is thereby placed on notice his “failure to make any response is seldom, if ever, excusable.”  Although the Court did not expressly identify a standard of materiality it is obvious that it intended to apply the “may have affected the trial outcome” standard.

Third, in those cases in which the defendant makes either no request or an overly general request, although the prosecutor will still have a duty to disclose favorable evidence, the standard of materiality will necessarily be higher than in the preceding situations.  The Court stated:

If the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.  This means that the omission must be evaluated in the context of the entire record.  If there is no reasonable doubt whether or not the additional evidence is considered, there is no justification for a new trial.

In 1985 the Supreme Court again confronted the issue of the prosecutor’s failure to disclose to the defendant favorable evidence.  In 
United States v. Bagley
, a divided Court replaced the 
Brady-  Agurs
 multiple materiality standards and adopted a single materiality standard.  In doing so, the Court rejected the distinctions between specific requests for exculpatory evidence and no requests for such evidence.  In 
Bagley
 the defendant was indicted for violating Federal narcotics and firearm statutes.  Prior to trial the defendant filed a discovery motion requesting that the trial court order the government to disclose “‘any deals, promises or inducements made to witnesses in exchange for their testimony.’” The government’s response to the defendant’s discovery motion did not disclose any “‘deals, promises or inducements.’”  Several years after the defendant was convicted, he discovered that the government’s only witnesses had executed contracts to provide to the Bureau of Alcohol, Tobacco and Firearms information concerning his activities, collect evidence against him and testify against him in court.  The witnesses were to be paid an amount of money “upon the accomplishment of the objective . . . .”

The Supreme Court noted initially that the rule of 
Brady v. Maryland
 was based on the requirement of due process, and its overriding purpose was to insure that a defendant receives a fair trial by requiring the prosecution to disclose favorable evidence.  The Court further noted that unlike 
Brady
 and 
Agurs
 the case involved impeachment evidence but it too was subject to the  
Brady
 dictates and should not be distinguished from any other exculpatory evidence.

The Court thereafter reviewed its holding in 
Agurs
 and the standards of materiality it established.  The Court also noted that since 
Agurs
, the Court had decided 
Strickland v. Washington
, which held:

[t]hat a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.”  The  
Strickland
 Court defined a “reasonable probability” as “a probability sufficient to undermine confidence in the outcome.”

The Court then dispensed with the 
Agurs
 standards of materiality that distinguished between “no request,” “general request,” and “specific request” cases and concluded that the standard identified in 
Strickland v. Washington
 would be “sufficiently flexible to cover all of the preceding situations.”

Significantly, however, the majority opinion did not disturb the standard of materiality announced in 
Agurs
 for cases involving the prosecution’s knowing utilization of perjurious testimony.

In  
Ex parte Turner
, this Court adopted the 
Agurs
 test for materiality in both specific request and no request cases.  Implicitly, the Court adopted the 
Agurs
 standard of materiality when perjured testimony is utilized.

In  
Hernandez v. State
, we adopted the 
Strickland v. Washington 
standard to resolve claims of ineffective assistance of counsel.  We are now equally persuaded by the reasoning of the Supreme Court in 
Bagley
 when it adopted the 
Strickland
 standard for materiality in cases involving exculpatory evidence.  Since the  
Bagley
 Court did not disturb the standard of materiality established in 
Agurs
 when dealing with the prosecution’s knowing use of perjured testimony we hereby expressly adopt that standard also.

Comparing these standards to the trial court’s findings it is obvious that habeas corpus relief is necessary.  The statement Miller gave to the police on December 3, 1976, which the trial court found the State intentionally failed to disclose, contains statements that are the diametric opposite of Miller’s trial testimony.  During the writ hearing the applicant’s attorney introduced, without objection, an exhibit that details the abundant discrepancies between the two statements.  Obviously, this is the type of prior inconsistent statement that could have had the effect of substantially soiling Miller’s direct identification testimony.  In  
Napue v. Illinois
, the Supreme Court observed that the State’s principal identification witness had, contrary to his trial testimony, been offered something in exchange for his testimony.  In finding that the prosecutor had a duty to correct the perjured testimony the Court commented, “The jury’s estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.”  Had Miller’s statement been provided to the defense, as the trial court had ordered, it would have obviously constituted a secure basis for impeachment and could have nullified the effect of her otherwise unimpeached identification of the applicant.
(footnote: 29)

The majority in the case now before this court does not analyze the importance of the newly discovered evidence that Ebert committed perjury in describing his role in the murder.  Rather, the majority assigns to Appellant a burden of persuasion that does not clearly and unequivocally exist in the law that governs this issue.  Instead of examining the record to determine the impact of Ebert’s perjury, the majority requires Appellant to convince us that he would have been acquitted if Ebert had testified truthfully.

The majority does not consider the effect that truthful testimony would have had on the jury charge or upon the sufficiency of the evidence.  That is, the majority does not consider that the revealed perjury shows that Ebert is, like the other eyewitnesses, an accomplice.  A person who is merely present at the scene of the offense is not an accomplice; an affirmative act or omission is required.
(footnote: 30)  
A defendant is not entitled to a jury instruction on the accomplice witness rule if another person was merely present at the scene of the offense.
(footnote: 31) When the evidence shows that a witness is a party to the offense for which a defendant is being tried, however, the defendant is entitled to a jury instruction that tells the jury that “[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.”
(footnote: 32)  The corroboration cannot come from another accomplice who testifies in court.
(footnote: 33)
 Ebert’s perjured testimony portrayed him as an innocent bystander, merely present at the murder scene.  Appellant did not request an accomplice witness instruction as to Ebert, and, if Ebert was merely present, Appellant was not entitled to the jury instruction.
(footnote: 34)  I would point out that the evidence at trial showed that the other eyewitnesses to the murder were also participants.  As Judge Womack observed in 
Herron, 
“
[I]f there was no charge at all on the law of accomplice-witnesses, there is no chance that the jury could have applied the law correctly.”
(footnote: 35)
 The majority does not discuss the impact of Ebert’s perjury on Appellant’s ability to convince the trial court that Ebert was an accomplice as a matter of law or to convince the jury that Ebert was an accomplice as a matter of fact.  The majority does not discuss the effect of a jury instruction on accomplice testimony.  Nor does the majority discuss the impact of independent impulse evidence.
(footnote: 36)  Of equal significance in determining whether Appellant should have been granted a new trial, the majority does not evaluate the condition of the remaining evidence when all accomplice testimony is excluded.
(footnote: 37)
 Perjury undermines the very fabric of our justice system.  Our rule of law depends on honesty:  on honest judges, on honorable counsel, and on witnesses who are governed by the sanctity of the oath they swear or affirm.  When any element of this rule of law fails its obligation of honesty, both the State and the defendant are denied a fair trial, and the public is denied a belief in the integrity of our justice system.  Both the trial judge and the lawyers in this case behaved honorably; it is the witness Ebert who violated his oath.  Because the majority fails to assess the impact that Ebert’s lies had on Appellant’s right to a fair trial, I am compelled to dissent.

LEE ANN DAUPHINOT

JUSTICE

PUBLISH

FOOTNOTES
1:
Jackson had been “seeing” Tacina. 

2:
Jackson is the father of Doyle’s son and the cousin of Frank. 

3:
Ebert testified at trial that Frank picked up the brick in the trailer park, but after trial Ebert admitted that he picked up the brick in the trailer park; the State filed a stipulation of evidence disclosing this information.  

4:
Because the meeting with the judge concerning Ebert’s new testimony that he, not Frank, picked up the brick occurred in chambers, we have no idea whether Frank attempted in this meeting to meet his burden of establishing that this change in one aspect of Ebert’s testimony would probably bring about a different result.

5:
The issues addressed by the dissent were not raised by Frank either in the trial court or in this court.  Frank nowhere claims that Ebert was an accomplice witness as a matter of law or fact; Frank nowhere asserts that he was entitled to a jury instruction on the accomplice witness rule; Frank nowhere asserts that the court’s charge was erroneous in any respect.  Because these issues were not raised by Frank, they could not in any event result in the reversal of his conviction.  
See Gerron v. State
, 97 S.W.3d 597 (Tex. Crim. App. 2003) 
(prohibiting court of appeals from reversing conviction on unassigned error)
; Hailey v. State
, 87 S.W.3d 118, 121-22 (Tex. Crim. App. 2002) 
(same), 
cert. denied
, 538 U.S. 1060 (2003).  Additionally, the dissent confuses error and harm; it is Frank’s burden to establish 
error
 in the failure to grant a new trial because newly discovered evidence would probably bring about a different result. 
 
See Keeter
, 74 S.W.3d at 36-37.  

6:
Miranda v. Arizona
, 384 U.S. 436, 86 S. Ct. 1602 (1966).

7:
378 U.S. 368, 84 S. Ct. 1774 (1964)

8:
Detective Barrett brought Frank a Coke and some chips just before the interview began. 

9:
The record does not contain a transcription of the taped conversation.

10:
We need not address whether there are corroborating circumstances that clearly indicate the trustworthiness of the statements because the first inquiry fails.  
Bingham
, 987 S.W.2d at 57. 

11:
Frank did not argue at trial, and he does not argue on appeal, that the photographs were not relevant.  We therefore presume that the photographs are relevant.  

12:
Dr. Sisler testified, however, that some of the “yellowish, almost parchment-like” area on State’s Exhibit 47 resulted from insect activity. 

13:
Geesa v. State
, 820 S.W.2d 154 (Tex. Crim. App. 1991).

14:
Majority op. at 9. 

15:
Tex. Code Crim. Proc. Ann.
 art. 40.001 (Vernon Supp. 2005).

16:
Keeter v. State
, 74 S.W.3d 31, 36 (Tex. Crim. App. 2002).

17:
See 
Tex. Gov’t Code Ann.
 § 311.016(2) (Vernon 2005); 
see also Albertson's, Inc. v. Sinclair
, 984 S.W.2d 958, 961 (Tex. 1999) (“We generally construe the word ‘shall’ as mandatory, unless legislative intent suggests otherwise.”).

18:
Keeter
, 74 S.W.3d at 36.

19:
Id.
 at 37.

20:
Id.

21:
Id. 
at 36-37.

22:
See
 majority op. at 9.

23:
Schutz v. State
, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001) (citations omitted).

24:
Ex parte Castellano
, 863 S.W.2d 476, 481 (Tex. Crim. App. 1993).

25:
Shutz
, 63 S.W.3d at 444 (citations omitted).

26:
Ex parte Richardson
, 70 S.W.3d 865, 870 (Tex. Crim. App. 2002) (citations omitted).

27:
Id.
 at 872-73 (citations omitted).

28:
768 S.W.2d 281 
(Tex. Crim. App. 1989).

29:
Id. 
at 289-91
 (citations and footnotes omitted).

30:
Blake v. State
, 
971 S.W.2d 451, 454 
(Tex. Crim. App. 1998).

31:
Russell v. State
, 598 S.W.2d 238, 250 (Tex. Crim. App.),
 cert. denied
, 449 U.S. 1003 (1980).

32:
Tex. Code Crim. Proc. Ann.
 art. 38.14 (Vernon 2005).

33:
See Herron v. State
, 86 S.W.3d 621, 631-33 (Tex. Crim. App. 2002).

34:
See Russell
, 598 S.W.2d at 250.

35:
Herron
, 86 S.W.3d at 635 (Womack, J. dissenting).

36:
See Solomon v. State
, 49 S.W.3d 356, 368 (Tex. Crim. App. 2001) (pointing out that there is no enumerated defense of ”independent impulse” in the penal code but that independent impulse evidence would “simply negate the conspiracy liability element of the State's case”).

37:
See 
Tex. Code Crim. Proc. Ann.
 arts. 38.14, 38.17 (Vernon 2005).