COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-053-CR

RICARDO MERCADO DIAZ APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)
------------

Ricardo Mercado Diaz appeals his conviction for indecency with a child and aggravated sexual assault of a child.  In three points, he complains that the evidence is factually insufficient to support his conviction and that the trial court abused its discretion by denying his motion for new trial based on newly discovered evidence.  We affirm.

Appellant was indicted for indecency and aggravated sexual assault of his step-daughter, J.O., who was seven years old at the time of trial.  A jury found him guilty of both offenses, and the trial court assessed his punishment at twenty years’ confinement for indecency with a child and fifty years’ confinement for aggravated sexual assault of a child.

In his first point, appellant asserts that the evidence is factually insufficient to support his conviction because J.O.’s testimony was orchestrated by her grandmother, who had a motive to create false allegations of sexual abuse in order to have appellant imprisoned and deported; the grandmother’s testimony was untruthful, inconsistent, and motivated by malice against appellant; the nurse’s testimony was inconclusive, unreliable, and inconsistent with J.O.’s testimony; CPS did not conduct a thorough examination; and weather conditions influenced the jury to reach a quick verdict against appellant. 

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.
(footnote: 2) 
 We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.
(footnote: 3)  To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the 
 the verdict.
(footnote: 4)
 In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court “harbor a subjective level of reasonable doubt to overturn [the] conviction.”
(footnote: 5)  We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury’s resolution of a conflict in the evidence.
(footnote: 6)  We may not simply substitute our judgment for the fact-finder’s.
(footnote: 7) 
 Unless the record clearly reveals that a different result is appropriate, we must defer to the jury’s determination of the weight to be given contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.”
(footnote: 8)  Thus, we must give due deference to the fact-finder’s determinations, “particularly those determinations concerning the weight and credibility of the evidence.”
(footnote: 9) 

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.
(footnote: 10)  Moreover, an opinion reversing and remanding on factual insufficiency grounds must detail all the evidence and clearly state why the finding in question is factually insufficient and under which ground.
(footnote: 11)
 The following evidence was presented to the jury at the guilt-innocence phase of the trial:

When J.O. was seven years old, she lived in The Colony with her mother, Bessy Ortez; her two brothers; and her stepfather, appellant.  J.O. stated that during that time, appellant always took care of the children on Sundays when Bessy worked.

According to J.O., appellant “touched” her in the living room and bathroom of her house on the Sundays her mother worked.  J.O. testified that the most recent time appellant “touched” her was on March 20, 2005, a Sunday, in the bathroom her mother and appellant shared.  J.O. stated that appellant asked her to come to the bathroom, and when she got there, he asked her to take off her clothes.  After she took off all of her clothes, appellant picked her up, put her on the sink, locked the door, and turned off the light.  J.O. then began to describe how appellant had “squeezed” her, but then stated that she had “messed up” because she had “skipped something” when she forgot to mention that appellant “unzipped his zipper and then took out his private.”  J.O. then testified that appellant “unzipped his zipper,” “took out his private,” and put his “private” into her “private.”  J.O. described appellant’s “private” as “kind of straight, but a little bit hanging [down].”  J.O. then used dolls to demonstrate to the jury what appellant had done. 

J.O. testified that appellant had touched her at least one other time while they were in the living room of her house in The Colony.  On that occasion, appellant and J.O. were sitting on the couch together when appellant touched her “on [her] private” and “would move his finger in [her] private up and down.”   On March 21, 2005, the day after the last assault, J.O. told her grandmother, Rosa Ortez, about what appellant had done.  J.O. told Rosa first because she trusted her.  After J.O. told her about the abuse, Rosa immediately examined J.O.’s private parts.  J.O. then wrote down what happened on a piece of paper without help from Rosa or any other person.  

On cross-examination, J.O. testified that Rosa had previously told her that appellant was not her biological father, which made her “a little bit” sad, and that she was not as happy as when she thought appellant was her real father. J.O. testified that from time to time, she wrote her thoughts in a diary or journal, and that one day, she wrote that her mother was mean and that her grandmother was her mother.  

Rosa, J.O.’s grandmother, testified that for several months before J.O.’s outcry, Rosa would occasionally watch Bessy’s children on Sundays, but that appellant would usually watch the children on those days.  On March 21, 2005, when J.O. made her outcry to Rosa, Rosa waited for Bessy to come home and then told her what J.O. had said.  Rosa, Bessy, and J.O. went to the house in The Colony to confront appellant, and appellant denied J.O.’s accusations.  On Friday, March 25, 2005, Bessy and Rosa took J.O. to the hospital.  

At the hospital, J.O. was examined by Paula Fornara, a sexual assault nurse, approximately five days after the last assault.  Fornara testified that about ninety-six percent of sexual assault exams do not show injuries, but she found two injuries to J.O.’s genitalia, including an abrasion that indicated some sort of blunt force trauma.  Fornara testified that J.O.’s injuries were consistent with the girl’s story and that she found medical evidence that J.O.’s sexual organ had been penetrated.  Fornara further stated that the areas where she had found injuries would not be areas that a child would scratch or touch herself because it would be “extremely painful” to a child J.O.’s age; Fornara admitted, however, that it was “possible” that the abrasion to J.O.’s genitalia could be a scratch.  Fornara also stated that J.O. had told her that appellant had assaulted her practically every Sunday, but Fornara did not obtain a history of each assault.  

Bessy testified that appellant watched her children on Sundays while she was at work, but “not every Sunday.”  She said that J.O. told her the same thing she told Rosa about the last assault.  Bessy also acknowledged that she had heard from one of appellant’s sisters that appellant had put cream on J.O.’s private parts, which she thought was unusual because appellant had no responsibility for tending to J.O. in that way.  Bessy said that in October of 2004, Rosa told her that she suspected appellant was sexually abusing J.O. because she had noticed that J.O.’s private parts were inflamed.  She further testified that Rosa did not like appellant and that Rosa and appellant argued about who would be able to claim Bessy’s children as dependents for tax purposes. 

Rosa testified, however, that before J.O.’s outcry, she believed appellant was a good man and a good provider.  She denied that she and appellant had argued about claiming Bessy’s children on her income taxes.  

Avis Clark, a CPS investigator, conducted a forensic interview with J.O., which was videotaped and admitted into evidence.  Clark testified that she was aware that children could be coached by a dominant adult or could lie, but she had no reason to suspect that, in this case, J.O. was lying or had been coached.

After reviewing the evidence in a neutral light, we conclude that the evidence is factually sufficient to support appellant’s conviction
.
(footnote: 12) 
 There is no evidence that Rosa manipulated J.O. into falsely accusing appellant of assaulting her; in fact, the CPS investigator testified that she had no reason to suspect that J.O. had been manipulated in this case.  To the extent that there were inconsistencies among the  testimony of Rosa, Bessy, and J.O. regarding how often appellant took care of J.O. on Sundays, whether Rosa did not like appellant, and whether appellant and Rosa had argued about claiming Bessy’s children as dependents on their tax returns, we must defer to the jury’s determinations concerning the weight and credibility of the evidence.
(footnote: 13)  We must give the same deference to the jury’s determinations regarding the testimony of the CPS investigator and the nurse.
(footnote: 14)  Because the evidence supporting the verdict in this case is not so weak as to render the verdict clearly wrong or manifestly unjust, we overrule appellant’s first point.
(footnote: 15)
 In his second and third points, appellant asserts that the trial court abused its discretion by denying appellant’s motion for new trial based on newly discovered evidence.  Appellant contends that his diligent investigation led him to obtain the affidavit of Moris Medina, Rosa’s coworker, who stated that Rosa was upset with appellant in January of 2004 because he and Bessy were moving out of Rosa’s house.  Medina further stated that Rosa had told him that she would “destroy the life of [appellant] and remove him from the family.  That if Bessy [got] in [her] way, [she would] run over her too and take the children away from her.”  According to appellant, this newly discovered evidence would bring about a different result in another trial because it shows Rosa’s malicious intent to prosecute appellant.  

A new trial shall be given to an accused where material evidence favorable to the accused has been discovered since trial.
(footnote: 16)  A trial court has discretion to decide whether to grant a new trial based upon newly discovered evidence, and its ruling will not be reversed absent an abuse of discretion.
(footnote: 17)  The trial court’s discretion extends to situations in which the newly discovered evidence is the retraction of a witness’s testimony.
(footnote: 18)  To establish an abuse of discretion in the failure to grant a new trial based on newly discovered evidence, the appellant must show that (1) the evidence was unknown to him before trial, (2) his failure to discover the evidence was not due to a lack of diligence, (3) it is probably true, and its materiality will probably bring about a different result upon a new trial, and (4) it is competent, not merely cumulative, corroborative, collateral, or impeaching.
(footnote: 19)   Motions for new trial based upon newly discovered evidence are not favored by the courts and are viewed with great caution.
(footnote: 20)
 As his sole basis for admission of the proffered statement, appellant cites the rule governing impeachment by bias or interest and asserts that the statement is admissible to impeach Rosa’s testimony that she liked appellant and thought he was a good provider.
(footnote: 21)  Therefore, the main purpose of the evidence was to impeach Rosa’s credibility.  The evidence is also cumulative because, even without the proffered statement, appellant was able to present evidence to support his defensive theory that Rosa coached J.O. based on her hatred for appellant through Bessy’s testimony that Rosa and appellant did not get along, that Rosa had suspected appellant of sexually abusing J.O. as early as 2004, and that Rosa had argued with appellant in the past about claiming Bessy’s children as dependents for income tax purposes.  Further, given that the jury rejected the significance of the impeachment evidence and the defensive theory during appellant’s trial, there is no basis for concluding that a second jury would probably reach a different result in considering additional evidence with the same impeachment value.  We therefore have no basis for concluding that the undisclosed evidence will probably bring about a different result in another trial.
(footnote: 22)  Accordingly, we hold that the trial court did not abuse its discretion by denying appellant’s motion for new trial, and we overrule appellant’s second and third points. 

Having overruled appellant’s three points, we affirm the trial court’s judgment. 

PER CURIAM

PANEL A:  CAYCE, C.J.; LIVINGSTON and DAUPHINOT, JJ.

DO NOT PUBLISH 

Tex. R. App. P.
 47.2(b)

DELIVERED:  MAY 3, 2007 
 

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Watson v. State
, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).

3:
Watson
, 204 S.W.3d at 414-15, 417; 
Johnson v. State
, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

4:
Watson
, 204 S.W.3d at 417.

5:
Id
.

6:
Id
.

7:
Johnson
, 23 S.W.3d at 12; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

8:
Johnson
, 23 S.W.3d at 8.

9:
Id
. at 9.

10:
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

11:
Goodman v. State
, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001); 
Johnson
, 23 S.W.3d at 7.

12:
Watson
, 204 S.W.3d at 414-15, 417; 
Johnson
, 23 S.W.3d at 11.

13:
See Johnson
, 23 S.W.3d at 8.

14:
To the extent that appellant asserts that Fornara’s testimony was unreliable, he has forfeited the complaint because he did not make such an objection at trial. 
 See 
Tex. R. App. P.
 33.1(a)(1) (requiring a party to present the specific grounds for an objection to preserve a complaint for review).

15:
Appellant cites no facts within the record to support his assertion that the jury’s verdict was influenced by the dangerous weather conditions the last day of trial.  Therefore, we will not address this complaint.  
See
 
Tex. R. App. P. 
38.1(h).

16:
Tex. Code Crim. Proc. Ann. 
art. 40.001 (Vernon 2006).

17:
Keeter v. State,
 74 S.W.3d 31, 37 (Tex. Crim. App. 2002); 
Frank v. State
, 183 S.W.3d 63, 71 (Tex. App.—Fort Worth 2005, pet. ref’d).

18:
Keeter,
 74 S.W.3d at 37; 
Frank
, 183 S.W.3d at 71.

19:
Keeter,
 74 S.W.3d at 37; 
Frank
, 183 S.W.3d at 71.

20:
Drew v. State
, 743 S.W.2d 207, 225 (Tex. Crim. App. 1987), 
cert. denied
, 509 U.S. 925 (1993).

21:
See 
Tex. R. Evid.
 613(b).

22:
Keeter
, 74 S.W.3d at 36-37.