

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-13-00300-CR

Richard M. **LOPEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2009CR5395
Honorable Ron Rangel, Judge Presiding

Opinion by:  Catherine Stone, Chief Justice

Sitting:  Catherine Stone, Chief Justice
Karen Angelini, Justice
Rebeca C. Martinez, Justice

Delivered and Filed:  October 22, 2014

AFFIRMED

Richard Lopez was convicted by a jury of aggravated sexual assault and aggravated assault. On appeal, Lopez challenges the sufficiency of the evidence and the trial court's rulings on his motion to suppress and motion for new trial. Lopez also raises a double jeopardy challenge. We overrule Lopez's issues and affirm the trial court's judgment.

## BACKGROUND

Lopez pled guilty to aggravated assault after he severely beat J.S., the mother of his then three-year-old son, with a metal pole. A jury also found Lopez guilty of penetrating J.S.'s mouth

with his sexual organ, but acquitted him of charges that he penetrated J.S.'s sexual organ and anus with the metal pole. Lopez was sentenced to twenty years imprisonment for the aggravated assault offense, and life imprisonment for the aggravated sexual assault offense. Lopez appeals only the aggravated sexual assault conviction.

## LEGAL SUFFICIENCY

The jury was instructed to find Lopez guilty of aggravated sexual assault if the jury found beyond a reasonable doubt that Lopez intentionally or knowingly caused the penetration of J.S.'s mouth by Lopez's sexual organ without J.S.'s consent. The charge stated that sexual assault is without consent "if the actor compels the other person to submit or participate by the use of physical force or violence." The jury was further instructed to find Lopez guilty of "aggravated" sexual assault if it found that Lopez "did by acts or words place [J.S.] in fear that serious bodily injury would be imminently inflicted on [J.S.]."

Lopez contends the evidence is insufficient to show that he compelled J.S. to participate by use of physical force or violence. Lopez asserts no "physical act of force or violence occurred contemporaneously with the sexual act." Lopez further asserts "Lopez had attacked the complainant earlier in the day in the privacy of Lopez's bedroom with the metal pole, but a considerable period of time had elapsed between that incident and the alleged offense."

Lopez also contends the evidence is insufficient to show that J.S. was in fear that serious bodily injury would be inflicted on her if she refused his request for her to perform a sexual act on him. Lopez asserts any fear J.S. was experiencing was of future consequences "rather than a menacing risk of present danger" and any fear J.S. experienced was unreasonable given her child's presence in the room.

"Explicit verbal threats and physical injury are not necessary to prove a defendant compelled a victim's participation." *Edwards v. State*, 97 S.W.3d 279, 291 (Tex. App.—Houston

[14th Dist.] 2003, pet. ref'd). "Inherent in the concept of force, whether it be physical force, threats, or some other type of coercion, is that, when a person involuntarily faces distasteful options, it is very human to select that which is least distasteful." *Id.* "There are no set criteria by which it can be determined that force either has or has not been applied in any particular rape case, but rather, the facts of each individual case determine the issue." *Brown v. State*, 576 S.W.2d 820, 823 (Tex. Crim. App. 1978). "Whether consent was lacking must be determined from the totality of the circumstances in each particular case." *Bannach v. State*, 704 S.W.2d 331, 333 (Tex. App.—Corpus Christi 1986, no pet.). In order for fear of serious bodily injury to be imminent, the fear must relate to present injury, not fear of some future consequence. *Brown v. State*, 960 S.W.2d 265, 268-69 (Tex. App.—Corpus Christi 1997, no pet.).

J.S. testified that she was living with Lopez and their son on the day of the assault. While the three of them were at a child's birthday party at a restaurant, Lopez became upset, accused J.S. of flirting with another man, and demanded that they leave. When they arrived home, Lopez told J.S. to put their son, who was asleep, on the couch. Lopez then told J.S. to go to the bedroom with him. J.S. estimated that it was around 6:00 p.m.

As J.S. entered the room and Lopez closed and locked the door, Lopez hit her in the back of the head really hard, causing her to fall forward and black out. J.S. regained consciousness and was on her knees while Lopez was yelling at her and questioning her. If Lopez did not like the answer, he would punch J.S. in her face, head, and chest. When J.S. reminded Lopez that her ribs were injured, Lopez responded that he then knew where to hit her. When Lopez grabbed a metal pole, J.S. moved under a desk in the corner of the room to try to protect herself. Lopez then began striking J.S. on the areas he could reach, including her legs, calves and arms. Lopez used the pole to both strike and jab J.S. J.S. began bleeding. At that point, J.S. estimated that the beating had

lasted about an hour. Lopez then pulled J.S.'s pants off and inserted the pole into her vagina and anus. Lopez then told her to put her pants back on.

Sometime later, J.S. was back on her knees in front of Lopez. Lopez said he was going to ask more questions, and if J.S. gave the wrong answer, he was going to hit her with the pole. In response to one answer, Lopez hit J.S. across the side of the face and split open her eye. In response to the next answer, Lopez hit J.S. across the side of her face cutting her ear open (J.S.'s ear later had to be sewn back together). In response to another answer, Lopez raised the pole above his head with both arms and hit J.S. on the top of her head, splitting her head open (J.S. required staples to close this wound). At that point, J.S. started "freaking out" because blood was "gushing out everywhere." J.S. begged to be allowed to take a shower, and Lopez allowed her to shower with him. When J.S. told Lopez she was in pain, he urinated on her. Lopez exited the shower and asked J.S. another question. When she gave him an answer, Lopez punched her in the mouth.

After Lopez exited the bathroom, J.S. tried to run out through the front door, but Lopez grabbed her hair and dragged her in a choke-hold back to the bedroom. J.S. went to the closet to get dressed, but Lopez grabbed a knife and cornered her in front of the closet. J.S. tried to say things to get Lopez to stop because she was afraid he was going to kill her or inflict further pain. Lopez eventually put the knife down and allowed J.S. to get dressed and bandage her cuts. They returned to the bedroom and began smoking a cigarette. J.S. took some Tylenol for her pain and asked if she could lie down and go to sleep. Lopez told her she could not lie on the bed because she would get blood on the bed. J.S. then lay down on a blanket on the floor and went to sleep. J.S. estimated that it was around 11:00 p.m.

Around 2:30 a.m., J.S.'s son walked into the room. J.S.'s son started crying and tried to awaken Lopez because he saw J.S. bleeding and thought she was dead. Lopez then allowed J.S. to lie down on the blanket on the bed with him and their son to try to calm their son. Once their

son was asleep, Lopez took J.S.'s hand and started making her rub on his penis. Lopez then asked J.S. to perform oral sex on him. J.S. stated that she was still intimidated by what happened earlier and wanted to keep the peace. J.S. was still bleeding and in pain and did not even think to refuse. J.S. stated she was too afraid to refuse. J.S. estimated it was around 4:00 a.m. Lopez and J.S. began watching a movie and smoking their last cigarette. When Lopez asked J.S. to get another box of cigarettes from her car, J.S. drove away and went to the nearest hospital.

From the forgoing evidence, the jury could have inferred that Lopez compelled J.S. to perform oral sex through the physical force and violence he inflicted on her for five hours in the same room in which he then wanted to engage in oral sex while she was lying on a blanket to prevent her blood from getting on the bed. Although Lopez argues that the prior violence was too attenuated at the time Lopez requested oral sex, J.S. was still suffering from the numerous injuries Lopez previously inflicted on her which were both described in J.S.'s testimony and which the jury visualized from the photographs introduced into evidence, including an eye that had been split open, a head wound that required staples to close, and a split ear that had to be sewn back together. Moreover, J.S. had violently experienced over a course of several hours the type of physical force Lopez would use on her if she answered a question in a manner contrary to the answer Lopez wanted to hear. Finally, given the extent of the earlier violence, the on-going pain and bleeding from that violence, and J.S.'s testimony that she was too afraid to refuse, the jury reasonably could have inferred that she was in fear of imminent serious bodily injury. Accordingly, based on the totality of the circumstances, we conclude the evidence is legally sufficient to support the jury's findings.

## MOTION TO SUPPRESS

In his first issue, Lopez contends the trial court erred in denying his motion to suppress because: (1) the officers exceeded the implied license to knock on the door of his residence by

knocking continuously for five minutes; (2) the officers had no consent to search his house; and (3) he did not knowingly waive his rights when he was questioned and his statement was recorded at the police station.[1]

Officer Chad Mandry and Officer Alex King received a dispatch for a family violence disturbance. They were informed that: (1) an aggravated sexual assault had occurred; (2) J.S. was the victim; (3) Lopez was the perpetrator; and (4) a metal pipe was the weapon involved in the offense. The officers approached Lopez's house at approximately 5:50 a.m., having been informed that Lopez was at the location with a young child. The officers also had knowledge that Lopez previously had been arrested for a sexual assault of another victim and that Lopez "had threatened to use an AK against the police department in the future." Officer Mandry and Officer King approached the residence and knocked on the door. Officer Mandry stated that they knocked on the door numerous times for approximately five minutes before Lopez's mother answered the door. When Lopez's mother opened the door, the officers saw Lopez at the end of the hallway and asked him to approach the door. When Lopez got to the door, the officers "instructed him to the ground," placed him in handcuffs, and read him the *Miranda* warnings. Before the officers asked any questions, Lopez stated, "This is about my girlfriend." In response to questioning, Lopez stated that he struck J.S. a couple of times in the legs using a metal pipe. Lopez further stated that the metal pipe was in the garage. Officer King went to the garage to retrieve the metal pipe, but he could not locate it. Lopez offered to show the officers where the metal pipe was located, and the officers escorted him into the garage. Lopez gestured and told the officers that the pipe was in the corner behind some boxes. The pipe appeared to have blood on it.

---

[1] Lopez also contends that the trial court's findings of fact and conclusions of law are ambiguous and incomplete. We disagree. The trial court's findings, coupled with the complete record of the suppression hearing, provide a sufficient basis to review the trial court's rulings.

Detective Gregory Linsten interviewed Lopez at the police station. Before questioning Lopez, Detective Linsten read him the *Miranda* warnings and had Lopez sign the card containing the warnings. The card and an audio recording of the interview were admitted into evidence for purposes of the suppression hearing.

Lopez's mother also testified at the suppression hearing. She stated that she heard continuous banging on the door until she answered the door after about five minutes. The house contained an inner and outer door which each have locks. When Lopez's mother opened the inner door, she stated that the officers already had the outer door opened. She further stated that the officers pulled her outside and entered the house without her permission. The officers were calling for Lopez and then dragged him outside. The officers handcuffed Lopez and took him to the side of the house. After the officers left, Lopez's mother noticed that the officers had broken the lock on the outer door. Rafael Villarreal, Lopez's half-brother, also testified that the outer door was broken after Lopez was arrested. On rebuttal, Officer King stated that the officers did not break the door.

J.S. testified that she lived with Lopez at the time of the assault. When J.S. spoke to the officer at the hospital, she told him her address and that Lopez would be at the house. J.S. told the officer that she wanted to press charges and gave the police permission to search the house for evidence.

### A.    Standard of Review

"We review a trial court's denial of a motion to suppress under a bifurcated standard of review." *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). "The trial judge's determinations of historical facts and mixed questions of law and fact that rely on credibility are granted almost total deference when supported by the record." *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). "But when mixed questions of law and fact do not depend on the

evaluation of credibility and demeanor, we review the trial judge's ruling *de novo*." *Id*. "We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case." *Turrubiate*, 399 S.W.3d at 150.

### B.       Knock and Talk

"Police officers are as free as any other citizen to knock on someone's door and ask to talk with them." *State v. Garcia-Cantu*, 253 S.W.3d 236, 243 (Tex. Crim. App. 2008).  In that situation, "'the knocker on the front door is treated as an invitation or license to attempt an entry.'" *Florida v. Jardines*, 133 S.Ct. 1409, 1415 (2013) (quoting *Breard v. Alexandria*, 341 U.S. 622, 626 (1951)).

Although Lopez recognizes the officers' right to knock on the door in this case, Lopez contends that the officers exceeded the scope of this implied license by knocking on the door for five minutes.  Lopez relies on the following sentence from *Jardines*, to support this contention, "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."  133 S.Ct. at 1415.

"*Jardines* does not [however] create a new constitutional protection or fundamental right." *Fuentes-Sanchez v. State*, No. 03-12-00281-CR, 2014 WL 1572448, at *6 n.12 (Tex. App.—Austin Apr. 17, 2014, no pet.) (not designated for publication).  "The *Jardines* opinion was limited to the question of whether the officers' behavior in using a drug-dog on the defendant's porch was a search within the meaning of the Fourth Amendment." *Id*.

The test for determining whether a consensual encounter becomes a search is whether "a reasonable person would feel free 'to disregard the police and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). As the Texas Court of Criminal Appeals has explained:

> Police officers may be as aggressive as the pushy Fuller-brush man at the front door, the insistent panhandler on the street, or the grimacing street-corner car-window squeegee man. All of these social interactions may involve embarrassment and inconvenience, but they do not involve official coercion. It is only when the police officer engages in conduct which a reasonable man would view as threatening or offensive even if performed by another private citizen [that] an encounter becomes a seizure. It is the display of official authority and the implication that this authority cannot be ignored, avoided, or terminated, that results in a Fourth Amendment seizure. At bottom, the issue is whether the surroundings and the words or actions of the officer and his associates communicate the message of "We Who Must Be Obeyed."

*Garcia-Cantu*, 253 S.W.3d at 243 (internal citations omitted).

In this case, the officers approached the house at a time when the residents would likely be sleeping. Under those circumstances, a reasonable person would understand that a brief knock at the door might not rouse the occupants. Although continuous knocking on the door for five minutes might be annoying, the officers made no "display of official authority" suggesting that they could not be ignored. *Id*. Accordingly, we hold the officers did not exceed the scope of a valid "knock and talk."

### C.    *Consent to Enter*

Lopez next contends the officers did not have consent to search the house. Because J.S. lived at the house with Lopez, however, she was entitled to consent to the search. *Brown v. State*, 856 S.W.2d 177, 182 (Tex. Crim. App. 1993). Lopez cites *Georgia v. Randolph*, 547 U.S. 103 (2006), as support to vitiate J.S.'s consent. In that case, however, the United States Supreme Court noted, "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." 547 U.S. at 106. Such a warrantless search becomes unreasonable only if another co-occupant, who is physically present at the location, refuses to permit entry. *Id*.

In this case, Lopez did not refuse to permit entry. Instead, he even directed the officers to the location where the metal pole was found. Accordingly, the officers had consent to search the house.

### D. Recorded Statement

Lastly, Lopez asserts he did not knowingly and voluntarily waive his rights before his statements were recorded at the police station. As the State notes, however, Lopez's recorded statement was never admitted into evidence. Therefore, even if the trial court erred in ruling the statement was admissible, the error "is irrelevant" and does not require a reversal. *Herron v. State*, 86 S.W.3d 621, 628 (Tex. Crim. App. 2002).

## MOTION FOR NEW TRIAL

In his third issue, Lopez contends the trial court erred in failing to conduct a hearing on his motion for new trial and in denying his motion. In his motion, Lopez asserted that new evidence had been discovered since trial, noting that J.S. expressed regret in her victim impact statement that Lopez received a life sentence. Lopez further asserted that he would have called J.S. to testify at the punishment hearing if he had known she would testify about her desire for Lopez to receive a lesser sentence.

### A. Waiver of Right to Hearing

The State initially contends that Lopez was not entitled to a hearing because Lopez's motion requested a hearing or, in the alternative, to be allowed to present affidavits prior to the trial court's ruling. Because the record contains an order establishing that the trial court reviewed J.S.'s affidavit which Lopez submitted to the trial court, the State contends Lopez was given the relief he requested. We disagree. In the document entitled "Presentment of Affidavit in Support of Motion for New Trial," Lopez prayed for the trial court to review the affidavit, consider it in

conjunction with his motion, "and conduct an evidentiary hearing on the same." Accordingly, Lopez continually requested a hearing on his motion.

### B. Hearing on Motion for New Trial

"When examining a trial court's denial of a hearing on a motion for new trial, we review for an abuse of discretion." *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009). "In so doing, we reverse only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Id*. (internal citations omitted).

A hearing on a motion for new trial is "not an absolute right," and "is *not* required when the matters raised in the motion for new trial are subject to being determined from the record." *Id*. at 338 (emphasis in original) (internal citations omitted). In addition, a defendant who raises matters that are not determinable from the record "is not entitled to a hearing on his motion for new trial unless he establishes the existence of reasonable grounds showing that the defendant could be entitled to relief." *Id*. at 339. Therefore, our review "is limited to the trial judge's determination of whether the defendant has raised grounds that are both undeterminable from the record and reasonable, meaning they could entitle the defendant to relief." *Id*. at 340. "This is because the trial judge's discretion extends only to deciding whether these two requirements are satisfied." *Id*. "If the trial judge finds that the defendant has met the criteria, he has no discretion to withhold a hearing." *Id*. "In fact, under such circumstances the trial judge abuses his discretion in failing to hold a hearing." *Id*.

With regard to the first requirement, the sole ground raised in Lopez's motion for new trial was newly discovered evidence of J.S.'s views regarding Lopez's punishment.[2] Since J.S. referred

---

[2] In his reply brief, Lopez suggests J.S. might have testified to additional facts beyond a simple punishment recommendation if Lopez had been given a hearing on his motion. Lopez suggests that J.S. would have testified about "Lopez's redeeming qualities, as well as to the probability of his future successful rehabilitation and reintegration into society after any future release." Lopez further suggests that J.S. would have testified about her complex relationship

to her views during her victim impact statement, her views are determinable from the record.[3]

Therefore, the trial court did not abuse its discretion in not holding a hearing on Lopez's motion.

With regard to the second requirement, Lopez's motion requests a new punishment hearing at which he would present J.S.'s views. "Several courts of appeals have held that a victim's testimony regarding what punishment should be assessed can properly be excluded from evidence." *Hines v. State*, 396 S.W.3d 706, 710 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citing *Wright v. State*, 962 S.W.2d 661, 663 (Tex. App.—Fort Worth 1998, no pet.) (holding testimony was not relevant to jury's punishment determination); *Hughes v. State*, 787 S.W.2d 193, 196 (Tex. App.—Corpus Christi 1990, pet. ref'd) (same); *Gross v. State*, 730 S.W.2d 104, 105-06 (Tex. App.—Texarkana 1987, no pet.) (holding testimony was beyond scope of permissible lay opinion testimony)). In his reply brief, Lopez cites an unpublished decision from the Dallas court of appeals suggesting that the testimony of a victim's husband regarding punishment was admissible. *Narro v. State*, No. 05-98-01263-CR, 2000 WL 1030508, at *3-4 (Tex. App.—Dallas July 27, 2000, no pet.) (not designated for publication).[4] The Houston court also has noted its belief that the Texas Court of Criminal Appeals has suggested in dicta that the testimony might be admissible. *Hines*, 396 S.W.3d at 710. Given the current state of the law, the trial court did not

---

with Lopez, her diminished concern about his future dangerousness, and the competing needs of punishing him and having him available to father their child. The only ground raised in Lopez's motion, however, was newly discovered evidence in the form of J.S.'s views on the punishment assessed. Although Lopez suggests in his reply brief that J.S. might have testified about these other topics, the trial court was determining whether a hearing was required based on the motion and affidavit; therefore, we do not consider Lopez's suggestions in reviewing whether the trial court abused its discretion in denying the hearing.

[3] In her affidavit J.S. stated, "I was saddened to learn that Richard got life in prison. I personally did not want Richard to get a life sentence. The attorneys for the State did not call me to testify at Richard's sentencing, but if they had I would have asked the jury to sentence Richard to a sentence of thirty or forty years. I would have liked to see him receive a lighter sentence than life in prison because I have very complicated emotions about Richard, who is the father of my son. … While I can understand why the jury gave Richard life in prison, I would like to set the record straight and let the jury know that life in prison is not what I want for Richard."

[4] The Dallas court alternatively held that if the testimony was inadmissible, the trial court subsequently withdrew the evidence and instructed the jury not to consider the statements, and the jury is presumed to have followed the instructions. *Id*. at *4-5.

abuse its discretion in refusing to hold a hearing because Lopez did not establish the existence of reasonable grounds showing that he would be entitled to present J.S.'s testimony at a new punishment hearing.

Finally, as previously noted, the trial court signed an order stating that it had reviewed J.S.'s affidavit filed in support of Lopez's motion for new trial. "[A] trial court may rule [on a motion for new trial] based on sworn pleadings and affidavits without oral testimony; live testimony is not required." *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). Because the trial court's order reflects that the trial court reviewed J.S.'s affidavit, the trial court was not required to consider live testimony at a hearing. *See id*.

### C.      *Allowing Motion for New Trial to be Overruled by Operation of Law*

With regard to the merits of the motion, "a defendant is entitled to have his motion for new trial granted if: (1) the newly discovered evidence was unknown to him at the time of trial; (2) his failure to discover the new evidence was not due to his lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial." *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003). As previously noted, the law does not support the proposition that J.S.'s opinion on punishment would be admissible at a new punishment hearing; therefore, the trial court did not abuse its discretion in allowing Lopez's motion to be overruled by operation of law. *See Klapesky v. State*, 256 S.W.3d 442, 455 (Tex. App.—Austin 2008, pet. ref'd) (applying abuse of discretion standard where trial court allowed motion for new trial to be overruled by operation of law); *Frank v. State*, 183 S.W.3d 63, 71 (Tex. App.—Fort Worth 2005, pet. ref'd) (same).

**DOUBLE JEOPARDY**

In his final issue, Lopez contends his conviction violates his double jeopardy protections because the factual basis for his prosecution in the underlying case was used as punishment evidence in an earlier trial in which he also was convicted of sexual assault of a different victim. *See Lopez v. State*, 358 S.W.3d 691, 697 (Tex. App.—San Antonio 2011, pet. ref'd). We rejected this same double jeopardy argument in affirming the earlier conviction, holding, "the admission of evidence of extraneous crimes or bad acts does not constitute a prosecution but rather shows the defendant's character, which is relevant to sentencing." *Id.*; *see also Lopez v. State*, No. 04-07-00472-CR, 2008 WL 859159, at *2 (Tex. App.—San Antonio Apr. 2, 2008, pet. ref'd) (not designated for publication) (same); *Ex parte Smith*, 884 S.W.2d 551, 553-55 (Tex. App.—Austin 1994, no pet.) (same). Having rejected this legal argument in two prior opinions, this court elects not re-visit the issue for a third time.

**CONCLUSION**

The trial court's judgment is affirmed.

Catherine Stone, Chief Justice

DO NOT PUBLISH