

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00209-CR

_____

TIMOTHY SCOTT SCOGGINS, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1541044R

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

A jury found Timothy Scott Scoggins guilty of four counts of burglary of a habitation and assessed his punishment at 47 years' confinement for each count. *See* Tex. Penal Code Ann. § 30.02(a)(1), (3), (d). After the trial court sentenced Scoggins, he filed a motion for new trial in which he alleged that he had newly discovered, material evidence—namely, after his trial, he learned that the State's DNA analyst had been disciplined for poor job performance.[1] The trial court heard Scoggins's motion and denied it.[2]

On appeal, in one issue, Scoggins contends that the trial court erred in denying his motion for new trial. We disagree for two reasons. First, Scoggins's newly discovered evidence would impeach the DNA analyst only on procedures not used in Scoggins's case. Second, other evidence showed that

---

[1]Scoggins filed an original motion for new trial that did not mention the newly discovered evidence and an amended motion for new trial, which did. All references are to Scoggins's amended motion. *See Fuentes v. State*, No. 07-19-00328-CR, 2020 WL 1314485, at *1 (Tex. App.—Amarillo Mar. 19, 2020, no pet.) (mem. op., not designated for publication).

[2]The trial court orally denied the motion, made a docket entry showing that it had denied the motion, and wrote on its "Certificate of Proceedings" that it had denied the motion. We have a ruling within 75 days of sentencing. *See* Tex. R. App. P. 21.8(a). What we do not have is a written order denying the motion. Rule 21.8(b) plainly requires an order in writing only when a new-trial motion is *granted*. *Id.* 21.8(b). On the other hand, Rule 21.8(c) deems a new-trial motion to be denied if it is not "timely ruled on by written order," suggesting that an order in writing is always required, no matter the ruling. *Id.* 21.8(c). Although Rule 21.8 presents an interesting semantic puzzle, the net effect is the same here: Scoggins's new-trial motion was denied, and we will refer to that denial as the trial court's act.

- the analyst had no performance issues with the test specifically used in Scoggins's case and

- the analyst's supervisor had verified the analyst's results.

Thus, the newly discovered evidence would probably not have brought about a different result.

We overrule Scoggins's issue and affirm the trial court's judgments.

**The Indictment**

The State alleged four offenses arising from a single criminal episode in a four-count indictment:

(1) Scoggins intentionally or knowingly entered Peggy Hanan's habitation without her consent with the intent to commit aggravated robbery with a firearm, *id.* § 30.02(a)(1), (d);

(2) Scoggins intentionally or knowingly entered Peggy's[3] habitation without her consent with the intent to commit aggravated assault with a firearm, *id.*;

(3) Scoggins intentionally or knowingly entered Zachary Hanan's habitation, without his consent, and attempted to commit or committed aggravated robbery with a firearm, *id.* § 30.02(a)(3), (d); and

(4) Scoggins intentionally or knowingly entered Zachary's habitation, without his consent, and attempted to commit or committed aggravated assault with a firearm. *Id.*

*See id.* § 3.01 (defining criminal episode).

---

[3]Because the facts involve victims who share the same last name, for clarity we refer to them by their first names.

# The Evidence at Trial

Peggy worked from home. One day while she was working, two burglars paid her a visit.

The first burglar—whom Peggy could see through the tall vertical windows in her twin front doors—was dressed nicely, wore a Cub Scout hat, and presented himself as someone looking for his mother's lost dog. Peggy obligingly unlocked the door, took the man's flier, and relocked the door.

Then the first burglar requested some water. Peggy fetched a bottle, unlocked the door again, and handed it to him; this time, however, the first burglar overpowered Peggy to force his way inside and—once inside—pulled a gun on her. At some point, the first burglar put a bandanna over his face.

After the first burglar satisfied himself that no one else was in the house, he radioed to someone else by walkie-talkie that the "coast [was] clear." The first burglar then put on latex gloves and tied Peggy up.

The second burglar—carrying a rifle and wearing a mask—entered Peggy's home and started ransacking it. While the second burglar searched, the first burglar stayed with Peggy.

The burglars' timing proved thorny; they too encountered unexpected visitors.

First, a glass contractor—who had an appointment with Peggy—came to the door. The first burglar told the second one to take off his mask and gloves, answer the door, and get rid of the contractor. Passing himself off as Peggy's nephew, the

second burglar then spoke to the contractor, told him that the appointment had been cancelled, and said that he would call his aunt to verify. A couple of minutes later, the second burglar returned and related that he had not been able to reach his aunt. Oblivious to what was going on, the contractor instructed the second burglar to have Peggy call his office to set up another appointment and left.

The burglars had less luck with the second unexpected visitor. Moments after the contractor left, Peggy's son Zachary returned home. The burglars waited in ambush, and when they heard Zachary go up the back staircase, the second burglar yelled out to Zachary to stop. Zachary described walking up the stairs, hearing someone call out his name, turning around, and seeing a man wearing a black ski mask pointing a rifle at his face. When Zachary did not stop, the first burglar told the second burglar to "go get him," and the second burglar took off after Zachary. Zachary escaped by running to a second-floor balcony and, from there, jumping down onto a portion of the first-story roof, scampering across the roof to another side of the house, and jumping off near the driveway.[4] Quickly changing tack, the first burglar

---

[4]In a matter of minutes, Zachary went from burglary victim to burglary suspect. Seeking help, Zachary knocked on his neighbors' doors until he found one that was unlocked, so he entered. Inside was a teenage girl watching television, but rather than calling the police, she insisted on calling her father. Impatient, Zachary left. At the next house, Zachary succeeded in getting someone to call for help. Walking back to his house, Zachary encountered the teenage girl's father. While holding a handgun to his side, the father ordered Zachary not to move and to put his hands up. The father then called the police to report Zachary.

said, "[W]e got to get out of here now," and the two burglars ran out the front door. Although still tied up, Peggy managed to phone 911.

A detective later found a latex glove in the master bedroom—where the second but not the first burglar had been. The glove was similar to the type that Peggy had seen the first burglar wearing. The detective sent the glove away for DNA testing. At trial, a DNA analyst testified that she found DNA on the latex glove, and after the DNA was tested, Scoggins's name turned up in a DNA-profile database as a match. Based on that match, the detective obtained a warrant and arrested Scoggins as the second burglar, the one who had entered the master bedroom.[5]

At trial, the only person to have seen the second burglar without a mask on—the contractor—could not identify him.

The jury found Scoggins guilty of each count in the indictment.

---

This father was not the only person with a weapon at home. Zachary himself had an AR-15 and a Walther PPS locked away in his bedroom, but he ran because he thought that he was being chased and would not have time to retrieve his guns.

The Texas Court of Criminal Appeals once commented that burglary of a habitation was a serious offense because it increased the chances of violent confrontations. *See Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1989) (op. on reh'g). This case underscores that observation.

[5]As for the first burglar, the detective had a suspect in mind, but law enforcement had been unable to locate him.

**The Evidence at the Hearing on Scoggins's Motion for New Trial**

In Scoggins's motion for new trial, he complained that the State's testifying DNA analyst had recently been disciplined for poor work performance.[6] At the new-trial hearing, the analyst's supervisor testified that on the same date the jury rendered its verdict on Scoggins's case, the DNA lab withdrew the analyst's authorizations to analyze data and issue reports. The analyst had testified at Scoggins's trial six days earlier.

The supervisor explained that the analyst's shortcomings occurred when she analyzed DNA mixtures; in contrast, Scoggins's case involved a high-quality single source, so the supervisor asserted that the analyst's conclusions were correct because the analyst had no issues when analyzing single-source DNA evidence. The supervisor characterized analyzing single-source DNA as "very straightforward" and analyzing DNA mixtures as "much more complex."

---

[6]In his brief, Scoggins complains that the State violated the Michael Morton Act and *Brady v. Maryland* by not disclosing the analyst's shortcomings earlier. *See* Tex. Code Crim. Proc. Ann. art. 39.14; 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963). But his motion for new trial does not raise that argument: Scoggins relied strictly on article 40.001 of the Texas Code of Criminal Procedure and cases construing it. The trial court heard and effectively denied only the motion for new trial. Scoggins had made two post-conviction requests under *Brady* and the Michael Morton Act, but at the new-trial hearings, Scoggins did not complain about the State's failure to comply with either of his post-conviction requests. Scoggins has not preserved this portion of his appellate argument. *See* Tex. R. App. P. 33.1; *Keeter v. State*, 175 S.W.3d 756, 759–60 (Tex. Crim. App. 2005).

The supervisor said that she had not redone the lab work; that is, she had not taken and analyzed a new sample because the analyst had not been disciplined for her lab work—"the actual evidence cutting, . . . the pipettes[,] the dilution, the amplification, [and] all those different steps . . . ." The State pressed the supervisor to explain why she had not redone the lab work:

> Q. I want to ask you something just for clarification. You said that she -- you've reviewed her work, but you did not actually go in and . . . reprocess the DNA samples and the reference sample.
>
> Why did you not do that? Why is that what you called "not necessary"?
>
> A. There were no issues detected with the work. The expected results were consistent with the quantitative values obtained. It was a high quality, single source profile. I saw no reason for the samples to be reprocessed, to consume additional evidence when it was unnecessary.

The analyst had been disciplined for errors in analyzing data or calculating statistics specifically when mixtures were involved; it was the mathematical part that the analyst was no longer allowed to do. Even then, none of the analyst's mathematical errors were what the supervisor called "critical errors," that is, the analyst's results had not led to a false inclusion, a false exclusion, or a false inconclusive. The supervisor had performed a complete review of the analyst's work in Scoggins's case and was confident that the analyst's results were accurate.

Although not entering a written order, the trial court denied Scoggins's motion on the record.[7]

## Applicable Law

A defendant has a right to a new trial when material evidence favorable to him has been discovered after trial. Tex. Code Crim. Proc. Ann. art. 40.001. To meet the materiality standard, a defendant must show that

> (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial;
>
> (2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence;
>
> (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and
>
> (4) the new evidence is probably true and will probably bring about a different result in a new trial.

*Carsner v. State*, 444 S.W.3d 1, 2–3 (Tex. Crim. App. 2014). Courts do not favor motions for new trial based on grounds of newly discovered evidence and view them with great caution. *Frank v. State*, 183 S.W.3d 63, 71 (Tex. App.—Fort Worth 2005, pet. ref'd) (citing *Drew v. State*, 743 S.W.2d 207, 225 (Tex. Crim. App. 1987)).

## Standard of Review

The trial court has discretion when deciding whether to grant a new trial based on newly discovered evidence, and absent an abuse of discretion, we will not reverse

---

[7]Whether the new-trial motion was expressly denied or deemed overruled by operation of law under Rule 21.8(c) is irrelevant.

its ruling. *Keeter v. State*, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002). An abuse of discretion occurs only if the trial judge acted arbitrarily and in a manner that was clearly erroneous. *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013). Put another way, an abuse of discretion occurs only if no reasonable view of the record—seen in the light most favorable to the trial court's ruling—supports the trial court. *Id.* The question is not how we would have viewed the facts or how we would have ruled. *Id.* We uphold the trial court if its ruling falls within the zone of reasonable disagreement. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004).

## Discussion

### A.    The first two elements

The State concedes that Scoggins met the first two elements: (1) the newly discovered evidence was unknown or unavailable to Scoggins at the time of trial and (2) Scoggins's failure to discover or obtain the new evidence was not due to a lack of due diligence. But the State contends that meeting two of the four elements is not enough; Scoggins had to meet all four. *See Carsner*, 444 S.W.3d at 3–4.

The State's concessions are important and carry great weight, but they are not binding. *Pickrom v. State*, Nos. 02-19-00188-CR, 02-19-00189-CR, 2020 WL 1808485, at *2 n.3 (Tex. App.—Fort Worth Apr. 9, 2020, pet. ref'd) (mem. op., not designated for publication) (citing *Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002), *modified on other grounds sub silencio by Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009)). Even when the State makes concessions, we must independently

examine the record because the proper administration of criminal law cannot be left to the parties' stipulations. *Id.*

For our purposes, though, we need not decide whether Scoggins met the first and second elements. *See* Tex. R. App. P. 47.1. As shown below, because Scoggins cannot meet the third and fourth elements, we must overrule his single appellate issue.

## B.     The third element

By showing that the analyst had made errors in other cases, Scoggins argues that he could cast doubt on her work in his case. But Scoggins's evidence would serve merely to impeach the analyst, and evidence that merely impeaches is not a valid basis for granting a new-trial motion based on newly discovered evidence. *See Carsner*, 444 S.W.3d at 2–3. The proposed evidence went strictly to the analyst's credibility, not to whether the analyst was "mistaken upon a material matter in the case." *See Jones v. State*, 711 S.W.2d 35, 37 n.5 (Tex. Crim. App. 1986).

## C.     The fourth element

And based on the supervisor's testimony, Scoggins could not show that the analyst had made any errors in his case; just the contrary, the evidence would show that the analyst's work was reliable. Thus, Scoggins could not show that the evidence would have probably brought about a different result. *See id.*

**D. Ruling**

We hold that the trial court did not abuse its discretion in denying Scoggins's motion for new trial (or allowing it to be overruled by operation of law) and overrule Scoggins's sole issue. *See Keeter*, 74 S.W.3d at 37.

## Conclusion

Having overruled Scoggins's sole issue, we affirm the trial court's judgments.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 3, 2020