

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00180-CR
No. 02-22-00181-CR
No. 02-22-00182-CR
No. 02-22-00183-CR
No. 02-22-00184-CR

_____

JOSHUA ALLEN ZIMMERER, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court Nos. CR19-00333, CR19-00334, CR19-00335, CR19-00336, CR19-00337

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

A jury found Appellant Joshua Allen Zimmerer guilty of one count of aggravated sexual assault of a child and four counts of sexual assault of a child stemming from his abuse of his niece, M.R.B.R. (Madison).[1] *See* Tex. Penal Code Ann. §§ 22.011(a)(2)(A), (B), .021(a)(1)(B)(i). The jury assessed his punishment at five years' confinement for aggravated sexual assault of a child and three years' confinement for each count of sexual assault of a child, and the trial court sentenced him accordingly, with the sentences to run concurrently. In two points on appeal,[2] Zimmerer argues that the evidence is insufficient to support his convictions and that the trial court abused its discretion by denying his motion for new trial. Because sufficient evidence supports his convictions and the trial court did not abuse its discretion by denying his motion for new trial, we will affirm.

---

[1]To protect the complainant's anonymity, we use an alias to refer to her and to some of her family members. *See* Tex. R. App. P. 9.8 cmt., 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[2]In the argument section of his brief, Zimmerer presents his challenge to the sufficiency of the evidence *before* his challenge to the trial court's denial of his motion for new trial. However, in a section of his brief labeled "Appeal Points Presented," Zimmerer lists his challenge to the sufficiency of the evidence *after* his challenge to the denial of his motion for new trial. In its brief, the State treats Zimmerer's sufficiency challenge as his "first" point and Zimmerer's challenge to the denial of his motion for new trial as his "second" point. We will do the same.

## II. BACKGROUND

### A. Madison's Familial Relationship with Zimmerer and Zimmerer's Wife

Madison's parents divorced when she was around two years old. In 2009, when Madison was around seven or eight years old, her mother's boyfriend raped her. Madison then went to live with her paternal grandmother (Grandmother) in Cooke County. At some point later, Grandmother's daughter—who is also Madison's aunt (Aunt)—began living nearby, and Madison and Aunt became very close.[3] Aunt was married to Zimmerer, thus making Zimmerer Madison's uncle through marriage.[4]

### B. The Alleged Abuse in January 2013

At Zimmerer's trial, Madison testified that Zimmerer had "assaulted [her] when [she] was in [the] sixth grade." She explained that she had been asleep in a bed in Zimmerer and Aunt's home, that she had been awakened by his sitting on the bed and rubbing her leg over the blanket, that he had then put his hand under the blanket and grabbed her butt, that he had then reached under her pajama pants and inserted his fingers into her vagina, and that he had then left the room. Madison did not initially tell anyone about this incident because she was "ashamed and didn't want to actually think that . . . it had actually happened."

---

[3]Madison described Aunt as "pretty much like [a] big sister." Aunt testified that she and Madison "always had a good relationship," noting that Madison would refer to her as "Mom" and that, over time, the relationship had changed from an aunt–niece relationship to a mother–daughter relationship.

[4]Aunt and Zimmerer were married in 2008.

According to Madison, this incident had occurred "early in the morning" in "early January." She initially testified that the incident had occurred in January 2012, although after Zimmerer's counsel indicated that Zimmerer had been living in North Carolina in January 2012,[5] Madison stated that the incident must have occurred around January 2013.[6] Madison was eleven in January 2013.

## C. The Alleged Abuse from October to December 2015

At Zimmerer's trial, Madison testified that he had sexually abused her on numerous occasions from October to December 2015, when she was fourteen years old. She stated that the abuse had progressed from his slapping her butt, to his kissing her, to his penetrating her with his fingers, to his "bringing condoms in with him." She testified that during that time period, Zimmerer had penetrated her vagina with his fingers "[d]aily." Madison also said that Zimmerer had penetrated her vagina with his penis and that on one occasion, he had "shoved" his penis into her mouth. She indicated that she did not initially tell anyone about these incidents because she was "ashamed."

---

[5]Aunt testified that she and Zimmerer had lived in North Carolina in January 2012, noting that they had moved back to Texas in July 2012.

[6]At Zimmerer's trial, his longtime friend, Garin Taylor, testified that between October 2012 and March 2013, he had lived with Zimmerer and Aunt. According to Taylor, Madison never spent the night in the house while he lived there, although he stated that Madison was "around in the daytime."

4

Madison testified that these incidents had taken place in Zimmerer's home mostly in the mornings before school, noting that the abuse typically occurred in the back bedroom where she had slept. According to Madison, during 2015—the year these incidents allegedly occurred—she was "mostly living with [Zimmerer] and [Aunt]" and spent "most nights" at their home. Other witnesses at trial, however, indicated that Madison did not live at Zimmerer and Aunt's home in 2015. To that end, Aunt testified that Madison had lived with Grandmother "[f]ull-time" in 2015, stating that she was "[o]ne hundred percent certain" that Madison had not lived with Zimmerer and her in 2015. Grandmother testified that in 2015, Madison had lived with her, and that during the October[7] through December 2015 timeframe, she and Madison would often leave her home around 6:30 a.m. or 7:00 a.m. because Madison had to go and feed a pig as part of a school club.[8]

_____

[7]Zimmerer presented evidence at trial to call into question Madison's assertion that abuse had occurred in October 2015. His employment records—which were admitted into evidence at his trial—reflected that he had been employed by Peterbilt from September 22, 2014, through October 9, 2015, and that he had worked the "night shift" from June 7, 2015, until October 9, 2015. Aunt testified that when Zimmerer had worked that shift, he typically would leave for work around 9:00 p.m. and that he would not get home until around 9:00 a.m. Cassandra Smith, a friend of Zimmerer's, testified that she had been married in Bowie, Texas, on Saturday, October 10, 2015, and that while Zimmerer and Aunt had stayed in Bowie "the entire weekend," Madison had not been present.

[8]Madison acknowledged that she had to take care of a pig in September and October 2015 as part of a school club, testifying that she had fed the pig in the mornings before school and in the afternoons after school. She stated that during that timeframe, she would leave Zimmerer's home around 7:20 a.m. each morning to go and feed the pig. As to who would drive her, Madison testified that "[i]t just kind

5

## D. Madison's School Paper Alluding to Zimmerer's Abuse

In or around December 2018, during her senior year of high school, Madison wrote a paper in her dual-credit psychology class in which she discussed having been sexually abused by her mother's boyfriend when she had been a young child. The paper also mentioned that she had been sexually abused when she was in the sixth grade and when she was fourteen, although it did not name her abuser.[9] Madison was proud of her paper, and she gave a copy of it to Jessica Hill, a counselor she was seeing at Abigail's Arms.[10] Due to Hill's concern with Madison's allusions to abuse in the paper, Hill made a report to Child Protective Services (CPS). Jennifer Matthews, a CPS investigator, conducted a forensic interview with Madison on January 24, 2019. During that interview, Madison did not disclose that Zimmerer had abused her.

---

of depended on who was available to take [her] to school," mentioning that sometimes Grandmother would take her to school and sometimes she would ride the bus. Mickie MaGouirk, the teacher sponsoring the school club, testified that during the 2015 school year, Madison had a pig that she was responsible for as part of the club. MaGouirk stated that Madison "sometimes" fed the pig in the morning—noting that Madison would feed the pig around 7:30 or 7:45 a.m.—although she acknowledged that Madison "might have missed a couple" of mornings feeding the pig. MaGouirk also stated that she had seen Grandmother drop Madison off to feed the pig but that she had never seen Zimmerer drop Madison off.

[9]At trial, Madison testified that the unnamed abuser discussed in her paper was Zimmerer.

[10]The record reflects that Abigail's Arms is a children's advocacy center. Madison began counseling at Abigail's Arms in or around November 2018 to deal with memories that were returning to her stemming from the abuse by her mother's boyfriend.

## E. Allegations Come to Light

On the evening of January 25, 2019, Madison's father called Aunt—his sister—and indicated that she and Zimmerer needed to read Madison's school paper because CPS was investigating them over allegations in it. Aunt called Madison to attempt to find out what had been said in the paper. Zimmerer was sitting next to Aunt in Grandmother's house during that phone call.[11] Madison told Aunt that the paper did not have to do with either Aunt or her children. Aunt then asked if the paper had to do with Zimmerer, and Madison remained silent. As recounted by Aunt, Zimmerer then took a deep breath and indicated that "[s]omething [had] happened with [Madison]." Aunt then immediately started yelling at Zimmerer, telling him to "shut up" when he tried to respond. Aunt also told Zimmerer to go to each of his kids and tell them goodbye, noting that she had assumed that Zimmerer had "molested [Madison] or something." According to Madison, she heard Aunt tell Zimmerer, "You're not going to go get the F'ing gun," and Madison hung up the phone.

Madison then drove to Grandmother's house, and she arrived to a "very chaotic" scene. Aunt testified that after Madison had arrived at the house, Zimmerer "made a suicide attempt." She recounted that Zimmerer "tried to get to a gun" but that she "beat him to it." Due to Zimmerer's attempt to get the gun and her belief that he was having an episode brought on by his post-traumatic stress disorder

---

[11]Madison, Zimmerer, and Aunt were staying with Grandmother at that time due to a leak in Zimmerer and Aunt's home.

(PTSD), Aunt called Zimmerer's brother, Ryan, and asked him to come and get Zimmerer.[12]

According to Madison, Zimmerer told her that "he was sorry" that night and asked if he could hug her. In her account of that night, Aunt did not recall Zimmerer apologizing to Madison, but she did recall his telling Madison, "[I]f you said I did [it], I believe you, but I don't remember. I'm not going to call you a liar, I'm not going to tell you that you're wrong." Aunt also indicated that when she attempted to hug Zimmerer after Ryan had arrived at the house, Zimmerer was "zombie like" and "just wasn't there." She stated that Madison had attempted to hug Zimmerer after Ryan had arrived but that Zimmerer had refused to hug her until Ryan made him. Later that night, Ryan drove Zimmerer to University Behavioral Health of Denton (UBH Denton) for mental-health treatment. According to Ryan, Zimmerer was not coherent during the car ride, and he had to help his brother fill out the paperwork at the hospital because he "cognitively wasn't there."

## F. Aunt's and Madison's Conversations with the Cooke County Sheriff's Office

In the early morning hours of January 26, 2019, Aunt and Madison went to the Cooke County Sheriff's Office. While there, they spoke with Deputy Michael Green. Aunt told Deputy Green, "[T]onight my husband told me that three years ago he

---

[12]Ryan testified that Zimmerer suffers from PTSD due to his past service in the Marine Corps. Aunt testified that Zimmerer had suffered from PTSD episodes in the past and that she had called Ryan on other occasions to deal with those episodes.

sexually molested my daughter who is actually biologically my niece."[13]  Aunt also told

Deputy Green that Zimmerer had cried and apologized and that he had said that he

had been "struggling" and "would touch [Madison]."[14]

During her conversation with Deputy Green, Madison denied that Zimmerer

had ever penetrated her with his penis.[15]

## G.  Zimmerer's Admissions Regarding the Abuse Made to Staff at the VA Medical Center

While Ryan initially took Zimmerer to UBH Denton, Zimmerer was ultimately

admitted to the VA Medical Center in Dallas on January 26, 2019.  Heather Martin, a

social worker at the VA Medical Center, testified that Zimmerer was admitted because

he was "suicidal" and had "asked for his wife to assist with shooting him because

of . . . legal issues with CPS."

Martin met with Zimmerer in person at the VA Medical Center.  She testified

that Zimmerer admitted to her that he had molested Madison and that he was unsure

---

[13]In contrast, at Zimmerer's trial, Aunt stated that she did not believe that he had ever used the word "molest," despite what she had told Deputy Green.

[14]At trial, Aunt testified that she had "assumed the worst" when Zimmerer had told her that "[s]omething [had] happened with [Madison]."  Aunt stated that Zimmerer had later explained to her what he had meant by that statement and that his explanation was "more than sufficient."

[15]At trial, Madison explained that she had denied that allegation at the time because she knew that it would be a "big . . . blow" to Aunt.  Madison indicated that she later disclosed that type of penetration after her "family switched sides" and she became "the outcast."

9

of the legal ramifications. Zimmerer told Martin that he was feeling guilty about having molested Madison given that she had been molested in her past. According to Martin, Zimmerer admitted to "fingering" Madison and to having "sex." Zimmerer told Martin that the abuse had occurred "daily for several months." He also told Martin, "I told my wife that I molested [Madison] on Friday and now my life is over."[16]

## H. Procedural History

Zimmerer was indicted on the following charges:

- In trial court cause number CR19-00333, Zimmerer was indicted for aggravated sexual assault of a child. That charge alleged that on or about January 1, 2012, he intentionally or knowingly penetrated Madison's sexual organ with his finger and that she was younger than fourteen years of age at the time.

- In trial court cause number CR19-00334, Zimmerer was indicted for sexual assault of a child. That charge alleged that on or about September 1, 2015, he intentionally or knowingly penetrated Madison's sexual organ with his finger and that she was younger than seventeen years of age at the time.

- In trial court cause number CR19-00335, Zimmerer was indicted for sexual assault of a child. That charge alleged that on or about September 15, 2015, he

_____

[16]Zimmerer's mother testified that she saw him when he was admitted at the VA Medical Center, that she saw him when he was discharged the next week, and that she had talked to him every day he was at the VA Medical Center. She described him during that time period as "[z]ombie like," "almost drooling," and incoherent. She also said that when Zimmerer was being spoken to, he responded "as if he was repeating what you said" back. Records from the VA Medical Center that were admitted at trial, however, reflect that at the time of his admissions to Martin, his speech was "normal (coherent)," his thoughts were organized, and he was able to process information.

10

intentionally or knowingly penetrated Madison's mouth with his sexual organ and that she was younger than seventeen years of age at the time.

- In trial court cause number CR19-00336, Zimmerer was indicted for sexual assault of a child. That charge alleged that on or about October 1, 2015, he intentionally or knowingly penetrated Madison's sexual organ with his finger and that she was younger than seventeen years of age at the time.

- In trial court cause number CR19-00337, Zimmerer was indicted for sexual assault of a child. That charge alleged that on or about October 15, 2015, he intentionally or knowingly penetrated Madison's sexual organ with his finger and that she was younger than seventeen years of age at the time.

Zimmerer's case proceeded to a jury trial. At trial, multiple witnesses testified regarding Madison's allegations that she had been abused by Zimmerer in January 2013 and from October through December 2015.[17] Other witnesses testified regarding Madison's credibility. In this regard, Maureen Tuggle—a friend of the Zimmerer family—testified that Madison did not have a reputation in the community for telling the truth. Lillian Tuggle—another friend of the Zimmerer family and Madison's alleged former best friend—testified that Madison was a "liar." Grandmother testified that Madison "does lie" and that Madison had once written her a letter apologizing "for being a liar." At trial, Zimmerer's defense expert, Dr. Brian Cutler, testified about false confessions, noting that PTSD is a risk factor for false confessions.

---

[17]We have detailed the relevant testimony regarding those allegations above.

The jury ultimately found Zimmerer guilty of all counts. Following the punishment phase, the jury assessed his punishment at five years' confinement for aggravated sexual assault of a child and three years' confinement for each count of sexual assault of a child. The trial court sentenced him accordingly, with the sentences to run concurrently.

Zimmerer filed a motion for new trial, arguing that he should be granted a new trial based on "new evidence discovered since his conviction."[18] Following an evidentiary hearing on the motion, the trial court signed an order denying it. This appeal ensued.

### III. DISCUSSION

## A. Sufficiency of the Evidence

In his first point, Zimmerer argues that the evidence is insufficient to support his convictions.

### 1. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to

---

[18]We will detail that evidence in our discussion of Zimmerer's second point.

resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately

13

describes the particular offense for which the defendant was tried. *Id.* The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021).

### 2. Applicable Law

As relevant to this case, a person commits the offense of aggravated sexual assault of a child if the person intentionally or knowingly causes the penetration of the sexual organ of a child younger than fourteen years of age. Tex. Penal Code Ann. § 22.021(a)(1)(B)(i). As relevant to this case, a person commits the offense of sexual assault of a child if he intentionally or knowingly causes the penetration of the sexual organ of a child younger than seventeen years of age or if he intentionally or knowingly causes the penetration of the mouth of a child younger than seventeen years of age by his sexual organ. *Id.* § 22.011(a)(2)(A), (B).

### 3. Analysis

Zimmerer argues that the evidence is insufficient to support his convictions. We disagree. As to his conviction for aggravated sexual assault of a child, Madison testified that Zimmerer had inserted his fingers into her vagina in January 2013, when she was eleven years old. And as to his convictions for sexual assault of a child, Madison testified that Zimmerer penetrated her vagina with his fingers "daily" from October to December 2015—at a time when she was fourteen years old—and that once during that time period, he had "shoved" his penis into her mouth. Madison's

14

testimony, even standing alone, is sufficient to support Zimmerer's convictions. *See Hutson v. State*, No. 05-22-00662-CR, 2023 WL 3735229, at *4 (Tex. App.—Dallas May 31, 2023, no pet.) (mem. op., not designated for publication) ("The testimony of a victim alone, even if that victim is a child, is sufficient to support a conviction for sexual assault of a child."); *Arriaza v. State*, No. 02-21-00128-CR, 2023 WL 2806255, at *2 (Tex. App.—Fort Worth Apr. 6, 2023, no pet.) (mem. op., not designated for publication) ("The testimony of a child victim alone is sufficient to support a conviction for aggravated sexual assault.").

Moreover, Madison's testimony does not stand alone. When confronted by Aunt, Zimmerer indicated that "[s]omething [had] happened with [Madison]," and, according to Aunt, he "made a suicide attempt." And rather than denying Madison's allegations when confronted, Zimmerer told Madison, "[I]f you said I did [it], I believe you, but I don't remember. I'm not going to call you a liar, I'm not going to tell you that you're wrong." Additionally, Aunt told Deputy Green that Zimmerer had admitted to "molest[ing]" Madison and had admitted to "touch[ing]" Madison. And, finally, Zimmerer admitted to Martin at the VA Medical Center that he had "molest[ed]" Madison in 2015, stating that he had "finger[ed]" her and that the abuse had occurred "daily for several months."

In his brief, Zimmerer argues that Madison's "changing and conflicting testimony about the dates and times of the alleged offenses casts serious doubt on her allegations." We disagree. "The 'on or about' language in an indictment allows the

15

State to prove a date other than the one alleged in the indictment 'as long as the date is anterior to the presentment of the indictment and within the statutory limitation period.'" *Carmona v. State*, 610 S.W.3d 611, 616 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (citing *Sledge v. State*, 953 S.W.2d 253, 255 (Tex. Crim. App. 1997)). Here, those conditions are met.[19] And as to any alleged "conflicting" testimony regarding those dates, we must presume that the jury resolved any conflicting inferences in favor of the verdict. *See Braughton*, 569 S.W.3d at 608.

Zimmerer also argues that "conflicting testimony . . . supports [his] claim of innocence," pointing to discrepancies in the testimony regarding Madison's living situation, her reputation for dishonesty, and his PTSD. But, once again, we must presume that the jury resolved any conflicting inferences in favor of the verdict. *See id.* And we may not re-evaluate the evidence's weight and credibility and substitute our judgment for that of the jury. *See Queeman*, 520 S.W.3d at 622; *see also Chandler v. State*, No. 02-19-00261-CR, 2020 WL 1949020, at *4 (Tex. App.—Fort Worth Apr. 23, 2020, no pet.) (mem. op., not designated for publication) (declining to disturb the jury's credibility determinations made in favor of the complainant).

---

[19]As to Zimmerer's conviction for aggravated sexual assault of a child, the evidence reflects that the assault occurred in January 2013, when Madison was eleven. As to Zimmerer's convictions for sexual assault of a child, the evidence reflects that the assaults occurred during the time period of October to December 2015, when Madison was fourteen. Zimmerer was indicted for those charges in 2019, well after the offenses were alleged to have taken place. *See Sledge*, 953 S.W.2d at 256; *Carmona*, 610 S.W.3d at 616.

16

After viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Zimmerer (1) intentionally or knowingly caused the penetration of Madison's sexual organ with his finger when she was younger than fourteen years old; (2) intentionally or knowingly caused the penetration of Madison's sexual organ with his finger on three separate occasions when she was younger than seventeen years old; and (3) intentionally or knowingly caused the penetration of Madison's mouth by his sexual organ when she was younger than seventeen years old. *See* Tex. Penal Code Ann. §§ 22.011(a)(2)(A), (B), .021(a)(1)(B)(i); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. Even if we could have found to the contrary were we sitting as the factfinder, we cannot act as the "thirteenth juror," and we may not substitute our judgment for that of the jury. *See Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (stating that a reviewing court should not act as a "thirteenth juror"); *Burgess v. State*, No. 02-19-00203-CR, 2021 WL 3556953, at *3 n.6 (Tex. App.—Fort Worth Aug. 12, 2021, no pet.) (mem. op., not designated for publication) ("[T]he factfinder alone—in this case, the jury—judges the evidence's credibility, and we may not act as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the factfinder."). We overrule Zimmerer's first point.

## B.  The Trial Court's Denial of Zimmerer's Motion for New Trial

In his second point, Zimmerer argues that the trial court abused its discretion by denying his motion for new trial.

17

## 1. Standard of Review

We review a trial court's denial of a motion for new trial for an abuse of discretion. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). A trial court abuses its discretion in denying a motion for new trial when no reasonable view of the record could support its ruling. *Id.* We must view the evidence in the light most favorable to the trial court's ruling without substituting our own judgment for that of the trial court, and we must presume that all reasonable factual findings that could have been made against the losing party were in fact made against it. *Id.*

At a motion for new trial hearing, the trial court alone determines the credibility of witnesses. *Id.* The trial court has "broad discretion to evaluate the credibility of witnesses and weigh the evidence to determine whether the new evidence will bring about a different result in a new trial." *Olsen v. State*, 606 S.W.3d 342, 352 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing *Colyer*, 428 S.W.3d at 122); *see Najar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App. 2021) ("[T]he trial court is the exclusive judge of the credibility of the evidence, regardless of whether the evidence is controverted, and its ruling will be reversed only for an abuse of discretion, that is, if it is arbitrary or unsupported by any reasonable view of the evidence.").

## 2. Applicable Law

To be entitled to a new trial based on newly discovered or newly available evidence, a defendant must establish that (1) the newly discovered evidence was

unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial. *Carsner v. State*, 444 S.W.3d 1, 2–3 (Tex. Crim. App. 2014); *Keeter v. State*, 74 S.W.3d 31, 36–37 (Tex. Crim. App. 2002). "Motions for new trial based upon newly discovered evidence are not favored by the courts and are viewed with great caution." *Frank v. State*, 183 S.W.3d 63, 71 (Tex. App.—Fort Worth 2005, pet. ref'd).

### 3. Analysis

In his motion for new trial, Zimmerer argued that certain evidence discovered after his convictions necessitated the trial court granting him a new trial. In support of that motion, Zimmerer attached affidavits from Misty Williford, Riley Dugger, and Timi Compton purporting to show the new evidence.[20] Williford, Dugger, and Compton each testified at the hearing on Zimmerer's motion for new trial.

---

[20]Williford's and Compton's affidavits were admitted into evidence at the hearing on Zimmerer's motion for new trial. While Dugger's affidavit was offered into evidence at the hearing, it does not appear from the record that the trial court ever admitted it into evidence.

### a. Evidence from Williford and Dugger[21]

According to Williford, in April 2019, she was working with Madison at Cracker Barrel when she noticed that Madison looked "very distraught and upset." Williford approached Madison to ask what was wrong, and Madison said that "she [had been] really upset with [Zimmerer and Aunt,] and she [had done] something really bad." When Williford asked what Madison had done, Madison allegedly stated that "she [had] lied that [Zimmerer had] sexually abused her." Williford told Madison to tell the truth, but Madison indicated that "she couldn't tell the truth because she would get in legal trouble." Williford stated that she did not mention her conversation with Madison to anyone before Zimmerer's trial because she "believed that [Madison] was going to do the right thing." At the hearing on Zimmerer's motion for new trial, Madison testified that she had never had a conversation with Williford about Zimmerer.[22]

---

[21]The respective evidence from Williford and Dugger has similarities, and in their briefs, both parties often discuss the evidence from Williford and Dugger together. We will likewise group our discussion of the evidence from Williford and Dugger.

[22]Williford testified that Zimmerer was a "distant cousin." She stated, however, that she had never "had long conversations with him." Zimmerer testified that he did not know Williford and that he had no reason to believe that Madison had ever made any statements to Williford regarding Madison's allegations against him. Williford also stated that she was a "distant cousin" of Madison's, and Madison indicated that she was related to Williford through her "step grandpa."

According to Dugger, in the fall of 2019, while she was at school with Madison, Madison told a group of people that she was not telling the truth about the allegations against Zimmerer because "she was mad or angry because of what [Aunt] and [Zimmerer] had." Dugger did not tell anyone about this alleged conversation prior to Zimmerer's trial because she "didn't think it was that big of a deal at the time" and she "didn't know that he was going to get convicted." At the hearing on Zimmerer's motion for new trial, Madison testified that she had never had a conversation with Dugger about Zimmerer, that she had never discussed him in a group setting at school, and that she had graduated high school in May 2019, a date before the alleged conversation.[23]

The State argues that a new trial is not warranted based on the evidence from Williford and Dugger because that evidence was "merely impeaching" evidence.[24] We agree. "Impeachment evidence is that evidence offered 'to dispute, disparage, deny, or contradict.'" *Taylor v. State*, 93 S.W.3d 487, 500 (Tex. App.—Texarkana 2002, pet.

---

[23]Dugger stated that Zimmerer was "a cousin through marriage." While Zimmerer acknowledged that Dugger was "a cousin [of his] somehow," he stated that he had no reason to believe that Madison had ever made any statements to Dugger regarding Madison's allegations against him. Dugger indicated that Madison was her "cousin[] as well."

[24]Indeed, the trial court also questioned how the testimony was not offered for impeachment purposes, stating, "How does [the testimony of Williford and Dugger] prove actual innocence? I mean, they didn't see anything. They don't know anything. They don't have any personal knowledge whatsoever of the dates and times alleged that offenses occurred. It's for impeachment."

ref'd) (quoting *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992)). The evidence from Williford and Dugger—evidence that Madison purportedly admitted to having lied about her allegations against Zimmerer—has no purpose other than to dispute, disparage, deny, or contradict her testimony against him.[25] *See Scoggins v. State*, No. 02-19-00209-CR, 2020 WL 5241197, at *5 (Tex. App.—Fort Worth Sept. 3, 2020, pet. ref'd) (mem. op., not designated for publication) ("[E]vidence that merely impeaches is not a valid basis for granting a new-trial motion based on newly discovered evidence.").

The State also argues that the evidence from Williford and Dugger is not material because that evidence, even if admitted at a new trial, would probably not produce a different result. We agree with the State. There was ample evidence that Madison was not lying about her allegations that Zimmerer had sexually assaulted her. In this regard, she testified to the assaults at Zimmerer's trial, and the trial evidence reflected that Zimmerer had made certain admissions regarding the assaults. Moreover, Madison denied having the alleged conversations with Williford and Dugger. In ruling on a motion for new trial based on newly discovered evidence, the trial court has the ultimate discretion to disbelieve testimony of the newly discovered

---

[25]In his brief, Zimmerer cites *Olsen* for the proposition that even if newly discovered evidence is impeaching, the evidence may still warrant a new trial if it is material and competent evidence independent of its impeaching tendency. *See* 606 S.W.3d at 353. But, as explained below, the evidence from Williford and Dugger is not material because it will not probably bring about a different result in a new trial. *See Carsner*, 444 S.W.3d at 2–3; *Keeter*, 74 S.W.3d at 36–37.

evidence, even if that testimony is uncontroverted.[26] *Colyer*, 428 S.W.3d at 122. Thus, the trial court did not abuse its discretion by denying Zimmerer's motion for new trial based on the evidence from Williford and Dugger. *See State v. Martinez*, No. 13-19-00434-CR, 2021 WL 921678, at *7 (Tex. App.—Corpus Christi–Edinburg Mar. 11, 2021, pet. ref'd) (mem. op., not designated for publication) (holding that witness's testimony that complainant had told him that she had fabricated her sex-assault allegations against the defendant would not have materially altered the outcome of the trial where witness's testimony would have to be believed over complainant's testimony). We overrule this portion of Zimmerer's second point.[27]

### b. Evidence from Compton

Compton and her late husband were close friends with Zimmerer and Aunt. According to Compton, her husband died in late 2012, and on January 3, 2013, she met Zimmerer and Aunt in Dallas, and they accompanied her to Oklahoma for her husband's burial on January 5, 2013. Compton maintained that she was with Zimmerer and Aunt in Oklahoma from January 3, 2013, through January 6, 2013, and

---

[26]Here, of course, the evidence from Williford and Dugger was controverted by Madison.

[27]In its brief, the State made alternative arguments for why the trial court did not abuse its discretion by denying Zimmerer's motion for new trial with respect to the evidence from Williford and Dugger. But because we have already held that the trial court did not abuse its discretion by denying the motion for new trial with respect to this evidence, we need not address the State's alternative arguments. *See* Tex. R. App. P. 47.1.

that Madison did not accompany them to Oklahoma. Compton also testified that she later saw Zimmerer and Aunt in "late January" 2013, noting that Zimmerer and Aunt had visited her in Oklahoma for "three or four days." She acknowledged, however, that from January 6, 2013, through "late January" 2013, she was not with Zimmerer and Aunt.

Zimmerer is not entitled to a new trial based on the evidence from Compton because the evidence from Compton was not unknown or unavailable to Zimmerer at the time of trial. The substance of Compton's testimony—that Zimmerer and Aunt were with her in Oklahoma during parts of January 2013 and that Madison was not present during those times—was known by both Zimmerer and Aunt because they were both with Compton at that time. Thus, because the evidence from Compton was known by Zimmerer at the time of trial, the trial court did not abuse its discretion by denying his motion for new trial based on that evidence. *See Carsner*, 444 S.W.3d at 2–3; *Keeter*, 74 S.W.3d at 36–37; *see also Kuhns v. State*, No. 03-01-00063-CR, 2002 WL 463223, at *7 (Tex. App.—Austin Mar. 28, 2002, pet. ref'd) (not designated for publication) ("Under any circumstances, this matter was not unknown to appellant nor was he unaware of it so that it would constitute newly discovered evidence entitling him to a new trial.").

Moreover, the evidence from Compton, even if admitted at a new trial, would probably not produce a different result. In this regard, Madison testified that Zimmerer had sexually assaulted her in January 2013. Compton's testimony would

24

only establish that Zimmerer could not have assaulted Madison for a few days in early January 2013 and a few days in late January 2013, leaving the bulk of January 2013 as potential dates for the alleged assault. Thus, because the evidence from Compton would not probably bring about a different result, the trial court did not abuse its discretion by denying Zimmerer's motion for new trial. *See Carsner*, 444 S.W.3d at 2–3; *Keeter*, 74 S.W.3d at 36–37; *see also Russell v. State*, No. 05-10-00330-CR, 2012 WL 360806, at *2 (Tex. App.—Dallas Feb. 6, 2012, pet. ref'd) (mem. op., not designated for publication) (holding that "the date of the crime is not an element of the offense that must be proven" and that date listed in indictment "is to be liberally construed and need not be substantiated"). We overrule this portion of Zimmerer's second point.

## IV. CONCLUSION

Having overruled both of Zimmerer's points, we affirm the trial court's judgments.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 21, 2023